GENERAL SERVICES
ADMINISTRATION,
Petitioner,

v.

PUBLIC SERVICE COMMISSION OF
the DISTRICT OF COLUMBIA,
Respondent.

The Chesapeake and Potomac Telephone
Company, Intervenor.

No. 81–1261.

District of Columbia Court of Appeals.

Argued Jan. 21, 1983.
Decided Dec. 6, 1983.

Patsy L. Mullanix, with whom Allie B. Latimer, Gen. Counsel, and Charles V. Curcio, Asst. Gen. Counsel, Washington, D.C., were on briefs, for petitioner.

Roberta Willis, with whom Lloyd N. Moore, Jr., Gen. Counsel, Michael D. Newsom, and Michael E. Geltner, Washington, D.C., were on brief, for respondent. Robert R. Strand, also entered an appearance for respondent.

D. Michael Stroud, with whom Lee A. Satterfield, Mark J. Mathis, and Robert A.

Levetown, Washington, D.C., were on brief, for intervenor.

Before NEBEKER,* MACK and PRYOR, Associate Judges.

PRYOR, Associate Judge:

On October 24, 1979, the Chesapeake & Potomac Telephone Company (hereinafter C & P or Company) filed an application with the Public Service Commission of the District of Columbia (hereinafter PSC or Commission), designated Formal Case No. 729, to increase and restructure its schedule of rates and tariffs for telephone service in the District of Columbia. The requested rate increase was intended to generate an overall rate relief of $9.2 million dollars.[1] During the course of the proceeding, C & P revised its figures for additional revenue requirements on two occasions. The final increase requested by the Company was for $25 million dollars.[2]

Petitioner, General Services Administration (hereinafter GSA) challenges PSC's final decision to grant an increase of $10.9 million dollars on the following grounds: (1) that the decision to reduce basic service rates was arbitrary, capricious, and unreasonable; (2) that the Commission's ruling was discriminatory in assigning the major revenue burden to vertical and private line services[3] while at the same time reducing basic services;[4] and (3) that the public notice given on the issue of private line rates was inadequate. We find GSA's arguments unpersuasive, and affirm the Commission's orders.

## FACTS AND PROCEDURAL HISTORY

In light of the changing telecommunications environment, and because the public

---

* Associate Judge Nebeker took no part in the disposition of this appeal.

1. The $9.2 million dollars requested by C & P represents a revenue increase of $6.9 million dollars (an increase of 3.5 percent) and a cost savings to the Company of $2.3 million dollars.

2. This amount reflected an anticipated reduction in demand as a probable result of the proposed increased prices of the services.

3. Vertical and private line (also called channel line) services are primarily used by larger businesses, local and federal governments for their telecommunications services.

4. Basic telephone services, which allows the user to make and receive local telephone calls, is used by all business and residential ratepayers in the District of Columbia, including GSA.

can now obtain telephone equipment from suppliers other than the telephone company, C & P requested a rate increase to cover the costs of providing services and equipment to its users. C & P's original request did not contemplate raising private line rates. However, because private line rates were far below cost, C & P chose to satisfy its additional revenue requirement by adjusting these rates. Despite the fact that the new rates were designed to cover costs, the rates, when priced to cost, resulted in a total revenue increase that was greater than C & P had requested.

On November 9, 1979, the Commission issued a Public Notice and Notice of Prehearing Conference that announced the possibility that private line rates might be affected. (26 D.C.Reg. 2154 (1979)). Private line rates were then explicitly made an issue of the proceeding by the Commission's Prehearing Conference Report and Order No. 7087. The projected increase in private line rates, although still below cost, amounts to an increase of 111 percent.

Pursuant to a full hearing, the Commission issued a Proposed Opinion and Order on May 28, 1981 (Docket No. 154, Order No. 7323) to which GSA, which had been granted intervention, filed exceptions on June 8, 1981.[5] The Commission's Proposed Opinion and Order No. 7373 approved a rate increase of $10.9 million dollars. This figure, which represents less than half of C & P's final $25 million dollar request, allows C & P to earn an overall return on investment of 10.7 percent.

On June 19, 1981, the Commission published its Final Opinion and Order No. 7345, adopting its Proposed Order to grant C & P the increase and denying all of GSA's exceptions. The rate increase went into effect on June 26, 1981, and on the following day, GSA filed an Application for Reconsideration. The application was deemed denied, by operation of law, on August 19, 1981.[6] This appeal, which is limited to the rate design portion of Formal Case No. 729, followed.[7] It should be noted that GSA is the only party seeking to have the order of the Commission vacated.

## SCOPE OF REVIEW

The jurisdiction of this court to hear and determine appeals from orders of the Commission is derived from D.C.Code § 43–905 (1981). This court has stated that "[o]ur review of a utility commission order is the narrowest judicial review in the field of administrative law." *Washington Gas Light Co. v. Public Service Commission,* 450 A.2d 1187, 1193 (D.C.1982) (citing *Potomac Electric Power Co. v. Public Service Commission,* 402 A.2d 14, 17 (en banc), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62

5. GSA was granted leave to intervene on February 6, 1980, pursuant to Order No. 7087. Intervention was also granted to: Enterprise Answering Service; D.C. Telephone Answering Service Committee; Arthur S. Curtis and the Telephone Users Association; and D.C. Federation of Civic Associations.

6. D.C.Code § 43–904(b) (1981) reads, in pertinent part:
Any public utility or any other person or corporation affected by any final order or decision of the Commission may, within 30 days after the publication thereof, file with the Commission an application in writing requesting a reconsideration of the matters involved, and stating specifically the errors claimed as grounds for such reconsideration. No public utility or other person or corporation shall in any court urge or rely on any ground not so set forth in said application. The Commission, within 30 days after the filing of such application, shall either grant or deny it. Failure by the Commission to act upon such application within such period shall be deemed a denial thereof. If such application be granted the Commission, after giving notice thereof to all interested parties, shall, either with or without hearing, rescind, modify, or affirm its order or decision ....

7. In October 1981, the General Services Administration filed a Petition for Review of the Commission's decisions Nos. 7323 and 7345 with this court. C & P became an intervenor in this case. On November 3, 1982, the Commission filed a "Motion for Summary Affirmance" which was denied on September 16, 1982. On September 22, 1982, a Settlement Conference was held at which Chief Judge Reilly, Retired, presided, and on September 23, 1982 an order was issued regarding subsequent filings and other procedural matters.

L.Ed.2d 182 (1979)); *Metropolitan Washington Board of Trade v. Public Service Commission,* 432 A.2d 343, 351 (D.C.1981).

■ In considering GSA's contentions, we recognize the authority delegated to the Commission by Congress, and accord deference to the expertise of the commissioners in those areas of utility regulation, such as rate design, in which the commissioners are particularly proficient. *Washington Gas Light Co. v. Public Service Commission, supra,* 450 A.2d at 1193. As such, the rate-making order is presumptively valid, and absent a showing of a "fatal flaw" in the action taken, the order will not be disturbed. *Id.* at 1194.

Our scope of review, as defined by D.C. Code § 43–906 (1981), is limited to "questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary or capricious."

## I.

Appellant first contends that the decision of the Commission to approve a reduction of basic service rates was arbitrary, capricious, and unreasonable, in violation of D.C. Code §§ 1–1509(e) and 43–906 (1981).[8]

In requesting increased rates before the Commission, C & P urged that the provision of service to all of its customers caused it to incur a revenue deficiency and that the increased cost of doing business necessitated a rate increase. GSA argues that the decision of the Commission to grant the increase was arbitrary, capricious and unreasonable, because the increase of rates for vertical and private line services was so high that it not only served to shelter basic service rates from the increased cost of doing business in the District, but also to reduce it by 67 cents per line per month. GSA further contends that rates for basic services were the only rates that needed to be substantially increased, and that the evidence of record would not support a 67-cent reduction unless all of the company's other rate proposals and adjustments were approved.

■ In examining the rate design portion of Formal Case No. 729, we must not only determine whether its overall impact is just and reasonable, *People's Counsel v. Public Service Commission,* 399 A.2d 43, 46 (D.C. 1979), but also whether the Commission "has made findings based on substantial evidence, and has applied the correct legal standards to its substantive deliberations." *Potomac Electric Power Co. v. Public Service Commission, supra,* 402 A.2d at 18, quoting *Williams v. Washington Metropolitan Area Transit Commission,* 134 U.S.App. D.C. 342, 362, 415 F.2d 922, 942 (1968), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969).

In arriving at the approved rate structure, the Commission sought to accomplish the following policy objectives:

[W]e [the Commission] must, at a minimum, provide for a rate structure that allows C & P a reasonable opportunity to earn the revenue requirement found proper in this case. In addition, the rate structure should apportion "fairly and rationally ... the burden of supplying the company's revenues among the persons

---

8. D.C.Code § 1–1509(e) reads in pertinent part:
 Every decision and order adverse to a party to the case, rendered by the Mayor or an agency in a contested case, shall be in writing and shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact. Findings of fact and conclusions of law shall be supported by and in accordance with the reliable, probative, and substantial evidence ....

D.C.Code § 43–906 reads in pertinent part:
 In the determination of any appeal from an order or decision of the Commission the review by the Court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious.

who make use of the service it provides." *Payne v. Washington Metropolitan Area Transit Commission,* 415 F.2d 901, 915 (D.C.Cir.1968). Principles of economic analysis suggest also that C & P rates should promote economic efficiency. Finally, we must weigh "equity" considerations.

Proposed Opinion and Order No. 7373.

■ In balancing the objectives of economic efficiency and equity, the Commission heard extensive testimony, considered numerous cost studies, and made an in-depth analysis of C & P's proposed reduction of basic service rates as well as the "impact of the substantial increases proposed by C & P for vertical services and channel (private line) services." When the Commission reduced the additional revenue requirement from $25 million dollars to $10.9 million dollars, it was faced with a rate proposal that was designed to generate far more than the Commission was willing to allow. In its Order No. 7373, the Commission found that the increases proposed by C & P "would be necessary ... if ... [PSC] were to allow the local exchange rate reduction and all of the additional revenues sought by C & P. . . . "

Given the Commission's decision to substantially reduce C & P's additional revenue requirement, the Commission felt obliged to reduce basic telephone service rates considerably below the amount that C & P had advocated. In an effort to prevent anticompetitive implications inherent in providing competitive service rates substantially below cost, the Commission decided to fix private line rates only slightly below cost; such rates, although increased, were below cost and below the rate which C & P proposed for private lines. Because the Commission allowed substantially less than the entire amount the company requested for private line rates, the Commission concluded that it was "possible to allow the local

exchange rate reduction without adopting the full amount of the vertical service rate increases proposed by the Company." [9]

Exceptions to its proposed opinion and order were filed by GSA, C & P, and the Telephone Users Association. After reviewing these exceptions, the Commission "found no persuasive reasons for making major changes to [its] proposed order." Minor changes were made with respect to rate structure determinations and were incorporated in Final Opinion and Order No. 7345. The new rate structure became effective on June 26, 1981.

This then is the crux of this aspect of the dispute. While there are legitimate and honest differences of opinion regarding this resolution of this complex problem, we are satisfied that the Commission fully explained the rate design it adopted in Order Nos. 7373 and 7345, and that the basic service, vertical, and private line rates represent just and reasonable rates. Consequently, we have no basis upon which to disturb those decisions.

II.

GSA next contends that the 67-cent reduction of residential rates was discriminatory in that the Commission assigned the revenue burden to some, but not all, services.

■ In determining whether a rate is discriminatory "the Commission [and this court] must consider whether customers have paid different amounts for the same service under the same circumstances." *Atlantic Telephone Co. v. Public Service Commission,* 390 A.2d 439, 444 (D.C.1978). Despite the fact that a difference in rates exists, GSA does not dispute the obvious fact that vertical, private line, and basic service rates represent different classes. It is clear in this jurisdiction that uniformity among rates of return from different customer classes is not necessary. *Washington*

---

**9.** In its Proposed Opinion and Order No. 7373, the Commission acknowledged that, in light of the recent actions by the Federal Communications Commission, it "intended to allow further

increases in the future, based on proper evidence, to bring [vertical and] private line rates fully into line with costs."

*Gas Light Co. v. Public Service Commission,* 450 A.2d 1187, 1207 (D.C.1982). Although a difference in rates between different classes of customers may appear to be discriminatory, all such differences are not necessarily an "unlawful discrimination." A difference in rates is permissible between different classes of customers provided the classifications themselves are reasonable, and the differences are based on the following factors: "the nature, time, and pattern of use so as to achieve reasonable efficiency and economic operation." *Atlantic Telephone Co. v. Public Service Commission, supra,* 390 A.2d at 444, quoting *Apartment House Council of Metropolitan Washington, Inc. v. Public Service Commission,* 332 A.2d 53, 57 (D.C.1975).

██ In the instant case, GSA has not shown, nor does the record suggest that the customer classifications were unreasonable. Given the reasonableness of such classification, the fact that the basic service rates were treated less markedly than were the vertical and private lines, does not amount to a showing of unlawful discrimination.[10]

### III.

██ Finally, GSA contends that the private line rates were not included in original application No. DN 49, nor in any subsequent filings, and were therefore not properly placed in issue. As previously noted, the Commission issued a public notice of prehearing conference, in the D.C. Register on November 9, 1979. The notice advised "that the issues in the proceeding may encompass not only the Company's rate proposal, but also increases or decreases in any

of the Company's rates and other changes in rate design or tariffs." The Commission then raised the issue of private line rates in its February 6, 1980 Order and Report on Prehearing Conference. GSA contends that the published notice was too broad to put persons who could have benefited from intervention on notice that private lines were in fact in issue.

In analyzing GSA's claim, we recognize that the practice of issuing broad notices is a conscious decision intended to minimize the risk of being so specific that the Commission is precluded from exploring legitimate avenues of review. We further note that those members of the general public on whom the decision impacts, tend to be sophisticated and sufficiently knowledgeable in their area of expertise to be expected to interpret the notice as capable of including private lines. The "broad" notice which was used in this instance is typical of the standard notice issued in public utility cases.

GSA's concern that private line rates were not properly put in issue, as evidenced by the record, does not suggest a procedural defect. Rather, while it concedes that it had actual notice, GSA attempts to assert the rights of potential intervenors who may not have been put on notice that private line rates could be increased in the proceeding. Any affected party, whose interest GSA seeks to represent, had the right to file an application for reconsideration of the final order of the Commission pursuant to D.C.Code § 43–904 (1981). Although participation in the proceeding is immaterial to filing a petition for reconsideration, we note

---

10. GSA also argues that the Commission misapplied the residual ratemaking practice when it based its 67-cent reduction on residual costs. The term residual costs describes revenue necessary to cover past costs which remain after proper increases have been made for all other classes of customers. Here, basic service rates were reduced *before* all other services were priced. GSA argues that by setting basic service rates before rates of other services, the Commission reversed the steps of residual ratemaking, and failed to comply with practices as described by the Company or the Commission.

GSA's position is that in order for the Commission to have complied with residual ratemaking, the basic service rate would have to have been set last, not first.

We are satisfied that the Commission did not engage in residual pricing when it authorized the decrease in basic exchange rates. Rather, the decision appears to have rested on a priority to make services affordable "to ensure that a basic level of telephone service is available to the public at large at as low a cost as regulatory law and economics permit."

that the only petitions filed in this case were by participants.

Given the adequacy of the notice and GSA's actual notice as evidenced by its active participation in the proceeding, we find that the public notice provided by the Commission constituted sufficient notice that private line rates could be affected during the proceeding.

*Affirmed.*