614 A.2d 1006

**BUILDING OWNERS AND MANAGERS ASSOCIATION OF METROPOLITAN BALTIMORE, INC.**

**v.**

**PUBLIC SERVICE COMMISSION OF MARYLAND, et al.**

**OFFICE OF PEOPLE'S COUNSEL**

**v.**

**PUBLIC SERVICE COMMISSION OF MARYLAND, et al.**

Nos. 92, 143, 144, 145, Sept. Term, 1992.

Court of Special Appeals of Maryland.

Oct. 29, 1992.

742

Timothy F. Umbreit, argued, Baltimore (Umbreit & Resnick, on the brief), for appellant, BOMA.

John M. Glynn, argued, Baltimore (Theresa V. Czarski and Paula M. Carmody, on the brief), both as appellant and appellee, People's Counsel.

Sandra Lee Hall, argued, Baltimore (Bryan G. Moorhouse, on the brief), for appellee, Public Service Com'n.

Roger D. Redden, argued, Baltimore (Martin E. Wolf, Piper & Marbury and Harvey J. Reed, on the brief), for appellee, BG & E.

Argued before WILNER, C.J., and GARRITY and CATHELL, JJ.

WILNER, Chief Judge.

Before us are four appeals from a judgment of the Circuit Court for Baltimore City affirming three orders of the Public Service Commission (PSC). The PSC orders were entered in connection with an application by the Baltimore Gas and Electric Company (BG & E) for an increase in its electric rates. These appeals and the responses to them raise three basic issues: (1) whether a party to a PSC proceeding is required to ask for a rehearing before the PSC before seeking judicial review; (2) whether the two-step procedure employed by PSC in approving a new rate structure for BG & E was in compliance with State law; and (3) whether the allocation of the rate increase among

the various classes of BG & E customers, and in particular the "G" and "GL" classes, conforms with State and Federal law. We shall affirm the judgment of the circuit court.

*Background*

On May 21, 1990, BG & E filed an application for a net increase in its electric rates of $198 million. The basis of the application was the assertion that, due to attrition [1] and other factors, the company was not earning its authorized 10.01% rate of return. It also informed the Commission that its Brandon Shores Unit 2 (BSU–2), a new coal-fired generating plant then under construction, was expected to begin commercial operation in May, 1991, and when that occurred the company would begin to incur many expenses not considered in setting its current rates. Because that unit was not then in service, however, BG & E initially proposed a two-step increase—$198 million to take effect June 20, 1990, and $52 million to take effect June 1, 1991, when BSU–2 became operational, that latter increase to be entirely offset by the savings in fuel cost attributable to BSU–2.

The PSC suspended the proposed tariff and set the matter for hearing. A number of people and organizations,

---

1. Attrition, in a utility regulation context, has been defined generally as the inability of a utility to earn its authorized rate of return due to the fact that its investment in rate base or its operating expenses are rising faster than its revenues. *See Potomac Elec. Power Co. v. Public Serv. Com'n,* 380 A.2d 126, 130 n. 3 (D.C.App.1977). More specifically, it has been stated that attrition "is the tendency of a utility's rate of return to diminish over time as a result of high construction costs, an expanding rate base, and increasing operating costs. Factors exacerbating attrition are inflation and regulatory lag: construction and operating expenses rise while the utility's tariffs remain fixed." *Wash. Gas Light Co. v. Public Service Com'n,* 450 A.2d 1187, 1219 n. 42 (D.C.App.1982). *See also Central Maine Power v. Public Utilities Com'n,* 382 A.2d 302, 316 n. 18 (Me.1978). In *Balto. Gas Co. v. McQuaid,* 220 Md. 373, 381, 152 A.2d 825 (1959), the Court defined "attrition" as "the term applied to the reduction in the rate of earnings resulting from additions to plant at costs higher than the value of similar items in the rate base, so that the relation between rate base and rate of return deteriorates from the company's point of view."

including People's Counsel, the Commission Staff, and an association of building owners and managers (BOMA), intervened. After extensive hearings, the Commission issued its Order No. 69054 on December 17, 1990. In that Order, the PSC approved a two-step increase in the company's electric rates in order to "reflect in rates both the costs of BSU–2, and the projected fuel cost savings, in a timely fashion." It granted an immediate increase of $76,964,000 and authorized BG & E to file an amended schedule of rates, along with a revised fuel rate, when BSU–2 entered service, expected to be about June 1, 1991. It directed BG & E to allocate both steps of the increase among its classes of customers in a manner calculated to narrow, but not extinguish, the disparity between their respective class rates of return. We shall examine both of these provisions—the two-step increase and the method of allocating the increase—in greater detail later in this Opinion.

Within 30 days after the filing of this Order, both People's Counsel and BOMA filed appeals to the circuit court. After those appeals were filed, but still within 30 days after issuance of the Order, BG & E moved for a rehearing by the PSC. Concomitantly, it moved to dismiss the appeals on the ground that, by declining to seek a rehearing themselves, People's Counsel and BOMA had failed to exhaust an available administrative remedy. On March 11, 1991, PSC denied BG & E's application for rehearing on the ground that, due to the pendency of the appeals, it had lost jurisdiction over the matter. In an exercise of caution, People's Counsel filed a second appeal in the event the court agreed with BG & E's position and dismissed the first appeal.

On April 29, 1991, BG & E filed the second step supplement and fuel cost adjustment, to take effect May 28, 1991, based on the coming into service of BSU–2. It regarded this filing, which was accompanied by its March, 1991 quarterly report and other information demanded by PSC in its December Order, as simply a compliance filing and not a new rate application. Over People's Counsel's objection,

the Commission regarded it that way as well. At its Administrative Meeting on May 22, the Commission, without conducting any further evidentiary hearing, found that the revised rates were in compliance with Order No. 69054 and permitted them to go into effect May 28, 1991. Those rates reflected an aggregate $124 million increase, offset in part by a $58 million decrease in the fuel rate, i.e., the cost of fuel that BG & E is allowed to pass on to its customers. People's Counsel noted an appeal (his third) from that decision.

After hearing argument, the circuit court, on December 9, 1991, disposed of all four appeals by denying BG & E's motions to dismiss the appeals of BOMA and People's Counsel and affirming the PSC decisions. We now have four appeals to this Court—three by People's Counsel and one by BOMA. The appeals by People's Counsel center on the two-step process used by the PSC and its "decision to approve, without a full opportunity for a hearing and without a sales adjustment, the approximately $124 million rate increase related to BG & E's [BSU–2] coal-fired generating plant beginning commercial service." BOMA's appeal raises the issue of the allocation of the increase among BG & E's classes of customers. As to all four appeals, BG & E presses its argument that the appellants failed to exhaust their administrative remedies by not seeking a rehearing by the PSC, as permitted by Md.Code art. 78, § 86. We shall deal with these issues in inverse order.[2]

---

**2.** BG & E has raised two other procedural issues in connection with BOMA's appeal, both having to do with BOMA's standing to participate in the PSC proceeding and to seek judicial review in the circuit court.

BOMA, as noted, is a trade association of building owners and managers who pay electric rates under Schedules G or GL. The association itself does not apparently pay electric rates under either of those schedules; its intervention in the PSC proceeding was clearly and exclusively on behalf of its members and not as a direct customer of BG & E. That intervention came in the form of a petition filed with the Commission on June 8, 1990. The Commission docketed the letter, as it did with all other petitions for intervention. No objections

*Exhaustion of Administrative Remedy*

Section 86 of article 78 permits any party in interest to apply to the Commission for rehearing within 30 days after service on it of a final order. Action on an application for rehearing lies in the discretion of the Commission, and, unless the Commission orders otherwise, neither the application nor the grant of a rehearing stays the enforcement of the order sought to be reviewed. *Id.* Acknowledging that "there is no reported Maryland decision directly on

were made to BOMA's petition, and it was allowed to participate fully in the proceeding, calling witnesses and making argument.

The first objection to BOMA's standing came in the circuit court in the form of a motion to dismiss BOMA's appeal. The company asserted that

"[a]lthough BOMA was admitted without objection as a party to the administrative proceedings before the Commission from which it seeks to take this appeal, because it is not itself a customer of the Company, it is not a party having sufficient interest in the outcome of the proceedings (an increase in electric rates) to have the requisite standing either to initiate or participate in any appeal provided for under Section 90 of the Public Service Commission Law...."

In that motion to dismiss, BG & E also asserted that the action of the PSC was not final because BG & E's petition for rehearing was still pending before the Commission.

A hearing on the motion was held on March 1, 1991. In an order entered May 29, 1991—nearly three months later—Judge Ward recited that, at the conclusion of that hearing, he had ruled that BOMA did not have standing but that the PSC was "ordered to leave the file open to provide B.O.M.A. with an opportunity to establish standing." It appears, although this is not entirely clear from Judge Ward's order, that he also concluded that, because of the pendency of BG & E's petition for rehearing, the order appealed from was not final.

As we observed earlier in this Opinion, on March 11, 1991, prior to the filing of Judge Ward's written order, the PSC denied BG & E's petition for rehearing. On July 22, 1991, it granted a motion for "Appearance of Intervenors Nunc Pro Tunc" filed by BOMA and one of its members, W.C. Pinkard & Co. Thereafter, on December 9, 1991, the court ruled that BOMA had standing to prosecute its appeal. BG & E argues that the court erred (1) in allowing BOMA to intervene *nunc pro tunc,* and (2) in finding, after such intervention, that it had standing.

Fascinating as these issues are, we shall not address them. For the reasons shortly to be explained, we shall find no merit in BOMA's appeal and, because of the public importance of the issue raised by BOMA, we choose to decide the case on the substance of the issue rather than on whether BOMA or its members had standing to raise the issue in the circuit court.

point," but relying on an Illinois case that seems to have turned on particular language in the Illinois version of the Administrative Procedure Act, BG & E urges that, unless a party takes advantage of § 86 and requests a rehearing, the party has not exhausted all available administrative remedies and is not, therefore, entitled to seek judicial review. That position is foreign to Maryland law, foreign in particular to the law governing the PSC, and foreign to the law generally throughout the country.

It seems clear that, had no earlier appeal been filed, any of the parties to the PSC proceeding could have filed an application for rehearing within 30 days after the December 17, 1990 order, and that, had any party done so, the time for noting an appeal to the circuit court would have been extended until the Commission acted upon the application. *See* art. 78, § 91, providing expressly that if a rehearing before the Commission is duly applied for, "proceedings for judicial review may be filed after the service of the decision of the Commission denying the hearing." *See also Flying "A" Serv. Stat. v. Jordan,* 17 Md.App. 477, 302 A.2d 650 (1973). That does not mean, of course, that an application for rehearing is a prerequisite for judicial review, only that, if one is filed, the time for seeking judicial review is stayed.

Complicating the matter now before us is the fact that one of the parties, BOMA, filed an order for appeal seeking judicial review before any of the other parties applied for rehearing before the Commission. That invokes the pronouncement made in *Balto. Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 157–58 n. 7, 501 A.2d 1307 (1986) that:

"The broad grant of authority in § 86(d) to rehear final orders is, we believe, impliedly limited by § 91, which authorizes the circuit court to assume jurisdiction over a final order of the Commission upon petition of an interest-

ed party. *Once the circuit court has assumed jurisdiction in such a case, its jurisdiction is exclusive.*" (Emphasis added.)

■ Because of BOMA's timely order for appeal prior to the filing of any application for rehearing, jurisdiction became vested exclusively in the circuit court, thereby foreclosing any action by the Commission on any application for rehearing subsequently filed. Under that circumstance, it is clear that, from and after BOMA's order for appeal, no available administrative remedy existed and thus subsequent timely appeals by People's Counsel were not barred.

■ Although the exclusive jurisdiction rule announced by the Court of Appeals applies directly to the appeal by People's Counsel, it does not address the validity of BOMA's appeal. That rests on the more general question of whether BOMA was required to apply for a rehearing before seeking judicial review.

Under Federal law, this issue is controlled by statute. Title 5 U.S.C. § 704, which is part of the Federal Administrative Procedure Act, provides for judicial review of agency actions that are made reviewable by statute or that are final and for which there is no other adequate remedy in a court. Section 704 goes on to state, in relevant part, that, "[e]xcept as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for ... any form of reconsideration...." Under this provision, absent some contrary statute or regulation, even the filing of an application for reconsideration does not bar judicial review, although the court may defer such review until the application is resolved by the agency.[3] *See Tallman v. Udall*, 324 F.2d 411

---

**3.** In fact, the Federal Energy Regulatory Commission has adopted such a regulation providing that a party aggrieved by an order, regulation, or amendment to a regulation issued under the Natural Gas Policy Act must, before seeking judicial review, file a petition for rehearing within 30 days after the date the order or regulation is

(D.C.Cir.1963), *reversed on other grounds,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964). Neither article 78 nor Maryland's Administrative Procedure Act has such a provision, and so the matter in this State is governed by the common law relating to judicial review of administrative orders.

In that regard, we find to be persuasive rulings of the United States Supreme Court made prior to the enactment of the Federal APA. In *Prendergast v. New York Telephone Co.,* 262 U.S. 43, 43 S.Ct. 466, 67 L.Ed. 853 (1923), the Court reviewed a judgment of the District Court enjoining the enforcement of certain orders entered by the New York Public Service Commission. Those Commission orders temporarily reduced the rates of the New York Telephone Co. In defending the action by the company, the Commission argued that judicial relief was inappropriate because the company had failed to seek reconsideration by the Commission of the challenged orders. Addressing that defense, the Supreme Court held, at 48, 43 S.Ct. at 468:

"It was not necessary that the Company should apply to the Commission for a rehearing before resorting to the court. While under the Public Service Commission[']s Law any person interested in an order of the Commission has the right to apply for a rehearing, the Commission is not required to grant such rehearing unless in its judgment sufficient reason therefor appear; the application for the rehearing does not excuse compliance with the order or its enforcement except as the Commission may direct; and any change made in the original order upon the rehearing does not affect the enforcement of any right arising from the original order.... As the law does not require an application for a rehearing to be made and

issued. 18 C.F.R. § 286.102(a) (1992). The regulation further states: "There has not been an exhaustion of administrative remedies until a petition for rehearing has been filed under this section and the proceeding is complete by the denial of the request, or if rehearing is granted, an order affirming, modifying or revoking the challenged order or regulation is issued." *Id.*

its granting is entirely within the discretion of the Commission, we see no reason for requiring it to be made as a condition precedent to the bringing of a suit to enjoin the enforcement of the order."

*See also United States v. Abilene & S. Ry. Co.*, 265 U.S. 274, 282, 44 S.Ct. 565, 567, 68 L.Ed. 1016 (1924).

The circumstances alluded to in the New York Telephone case are very close to those in the matter before us. An application for rehearing is permissive, not mandatory; the filing of such an application does not stay the effect of the Commission's order; and the granting or denial of the application is entirely discretionary with the Commission. Virtually every State and local administrative agency in Maryland is empowered, either specifically or by implication, to reconsider its decisions or grant a rehearing upon a timely filed motion. Yet never, to our knowledge, has an appellate court ever ruled that an order for appeal or other permissible resort to judicial review is premature because the party seeking such review failed to seek reconsideration or rehearing before the agency where the order sought to be reviewed was otherwise final. To adopt that view would constitute a radical change in procedure, for it would, in effect, make such applications mandatory rather than permissive. If that is to be done, it should be done not by the courts, but by the Legislature, which is the body principally charged with setting the procedures for administrative (i.e., Executive Branch) determinations of contested cases. In light of the fact that no such requirement exists for seeking review in this Court of a judgment of a circuit court, notwithstanding Md. Rules 2–533, 2–534, and 2–535, we especially see no reason to impose such a requirement in the review of administrative decisions that are otherwise final.[4]

---

4. We have serious doubt as to the efficacy of such a requirement in any event. As BOMA pointed out at oral argument, it had no basis for requesting a rehearing. It had no additional evidence to present and no additional argument to make to the PSC. It could not, therefore, reasonably expect the Commission, which had already considered

The circuit court therefore properly denied BG & E's motions to dismiss.

## Allocation of Rate Increase

In order to address properly the issues raised by BOMA, some introduction is necessary.

Article 78, § 68(a) requires the PSC to determine "just and reasonable rates of public service companies." Those are the only rates that such companies are allowed to charge. § 28(d). The term "just and reasonable rates" is defined in § 69(a) as:

"rates which are not in violation of any of the provisions of this article, which fully consider and are consistent with the public good, and which will result in an operating income to the public service company ... yielding, after reasonable deduction for depreciation and other necessary and proper expenses and reserves, a reasonable return upon the fair value of the company's property used and useful in rendering service to the public."

The PSC establishes these rates by examining the utility's income and expenses during a test year, calculating the rate base (the fair value of the property used and useful in rendering service) during that year, determining the utility's cost of capital (its required rate of return), and then multiplying that rate of return against the rate base. The result is the amount of income to which the utility is entitled. To the extent that level of income significantly differs from the test year's net income, the Commission orders an adjustment in the utility's rates—an increase or a decrease, as the case may be. The last phase of this process is to allocate any increase or decrease among the various classes of customers, for only then can the actual rates necessary to produce the approved level of income be calculated.

---

BOMA's position, to change its decision. BOMA simply disagreed with that decision and sought judicial review of it.

BG & E has a number of class schedules with respect to its electric service: Residential (Schedules R, RL, and ES); Commercial (Schedules G, GS, and GL); Industrial (Schedule P); Public street lighting (Schedule SL); Outdoor area lighting (Schedule PL); and Bethlehem Steel Corp., which has its own schedule. The rates for these various schedules and classes of customer differ. A residential customer does not pay the same as a commercial or industrial customer per KWH of electricity.

There are essentially two bases, or standards, for price differentials among classes of users—cost of service and value of service. *See* C. Phillips, *The Regulation of Public Utilities*, ch. 10 (1988). The first is based on the acknowledged fact that it is more expensive to serve some customers than to serve others; rate differentials are therefore based on what it costs the utility to serve each class, to the extent one can calculate those costs. The value of service standard, on the other hand, is based on differences in demand among the classes of customers—their need for the service, their ability to pay for it, and the availability of alternatives.

Although both techniques will produce differentials in rates, only the value of service standard is thought to involve discriminatory pricing. Differentials in rates that are based solely on differences in the cost of supplying the service are not regarded as discriminatory. As Professor Phillips points out, however, "[t]he cost of providing a particular service is difficult, if not impossible, to determine accurately." *Id.* at 414. Some costs, he observes, can be identified with a unit of output; others, that are commonly incurred in rendering different types of service, cannot be so easily allocated. Any method of apportioning those common costs is essentially judgmental and subject to dispute. Moreover, to some extent at least, Phillips regards discriminatory pricing as advantageous in a utilitarian sense. He observes, at 414–15:

"[W]hen one rate is charged for a service, a company may not be able to utilize its capacity fully. Only by discrimination may idle capacity be eliminated. Furthermore, discrimination is often socially desirable. If it allows a company to expand its sales and utilize its facilities more fully, average costs are reduced as fixed costs are spread over more units of output and the firm's profits are increased. Fuller utilization, in turn, may result in lower prices for all customers and in a wider use of the utility's services."

*See also* J. Bonbright, A. Danielsen, and D. Kamerschen, *Principles of Public Utility Rates,* 389–95 (1988).

The PSC, like most of its State counterparts, has not adopted the cost of service approach as the standard for setting rates. It has, however, at least since 1982, made conscious efforts to narrow the relative differentials among the class rates by examining the relationship between the rate of return for each customer class and the system-wide or average rate of return and, in allocating periodic rate increases and decreases, attempting to move each class rate of return closer to the system-wide rate of return.

As Professor Phillips observes, this is a complex and judgmental process to begin with, not marked with precision and exactitude. Apart from that, the Commission has decided that rate differentials may properly be based on factors other than the pure cost of providing the service. What it has done, however, is to recognize a zone of reasonableness—a band that straddles the system-wide rate of return—and to nudge the various class rates of return close to or within that band. *See Re BG & E,* 73 Md.PSC 6 (1982); *Re BG & E,* 74 Md.PSC 249 (1983).

Although at various times the Commission has expressed a desire to see that the class rates fall within specifically designated bands—of 10% or 7% above and below the system-wide rate of return—it has, on those occasions, always made clear its view that this is a goal and not a rigid requirement and that, to avoid dramatic increases or decreases in the rates charged to particular classes, the goal

must be approached gradually. In a 1984 rate case, for example, it declared that BG & E's effort to move class rates towards a 10% band was reasonable for purposes of that case, but added that:

"In the long run, an appropriate objective may be to move each customer class' rate of return toward a narrower margin above or below the average system rate of return. Of course, as stated in previous decisions, rates of return as calculated from cost-of-service studies are not the Commission's sole determinant in designing rates. This is because cost-of-service studies are, by their nature, judgmental. Among other considerations are: simplicity, feasibility of application, revenue and rate stability, relative business risks by class, avoidance of abrupt changes, and the ability of customers to respond in the short-run to rate design changes."

*Re BG & E*, 75 Md.PSC 171, 205 (1984).

Indeed, the next rate case resulted in a substantial reduction in BG & E's rates, and the Commission took that opportunity to move toward a 7% band by allocating the reduction first among those classes whose class rate of return was more than 7% above the average rate of return. *See Re BG & E*, 78 Md. PSC 129, 159 (1987). In a 1989 case, resulting in a $21 million increase, the Commission rejected People's Counsel's urging to return to a 10% band but recognized that it could not achieve a fixed 7% band either; in moving toward that goal, however, it directed that 80% of the increase be applied to residential and street and outdoor lighting classes with only 20% being allocated to the commercial and industrial classes. *Re BG & E*, 80 Md.PSC 496, 527–28 (1989).

The orders now before us also allocated a greater share of the increase to residential classes than to the commercial classes, although that allocation did not suffice to bring all of the classes within a 7% band. Schedules G, GS, and GL remained at least 16% over the system rate of return after the step one increase; the record does not reveal the disparity after the step two increase. In contrast, the

Schedule R rate remained 9% below the system average after the step one increase.

The question of allocation obviously creates some tension among the various classes of customers. People's Counsel, who represents residential and non-commercial customers, has tended to favor a wider band so that a disproportionate share of the required revenue can come from commercial and industrial users. Those users, whose class rates of return exceed the system average, understandably wish the band to be narrowed, if not eliminated entirely. That is what BOMA asked the PSC to do in this case and that is what its appeal is all about.

■ BOMA's position is that the treatment that has historically been accorded the G and GL classes—the commercial schedules to which its members are subject—is inequitable and unjustified. It claims, moreover, that the inequality is purposeful and not happenstance and results, at least in part, from the fact that BG & E has never proposed a schedule that would have each class paying a rate of return equal to the average rate of return. It thus sees the disparity not as the product of an inability to measure class rates of return but of policy decisions by BG & E and the PSC not to eliminate the disparity. Under the circumstances, it charges that the disparity contravenes §§ 26(a)(3) and 28(d) of article 78 and the 14th Amendment right of its members to equal protection of the law.

Section 26(a)(3) prohibits a public service company, in respect of any service furnished by it, from giving "any undue or unreasonable preference to or discriminat[ing] against or caus[ing] any undue or unreasonable prejudice to, any person, locality, or particular class of service." BOMA reads this section as requiring BG & E to "treat all customer classes equally in the rate making process" and as forbidding the PSC "from authorizing a rate design that shows preference to any customer class." Section 28(d) requires every public service company to "[c]harge just and reasonable rates, in accordance with the provisions of this

article, for the utility services rendered by it." BOMA reads that section as allowing the PSC to force adjustments in BG & E's rates to eliminate inequities among customer classes. The Constitutional argument is based on a number of Federal cases holding, in effect, that class rates of return established by the Federal Energy Regulatory Commission should be as nearly equal as possible.

As this introduction demonstrates, BOMA is correct in its assertion that the disparity among class rates of return is largely the product of policy decisions by BG & E and the PSC.

BOMA acknowledges that allocating costs among the various classes is not subject to absolute precision and seems willing to accept *some* disparity but wants it held to a minimum and not be the product of deliberate choice. The PSC, on the other hand, has acknowledged that wide disparities among class rates are inequitable. It has balanced that inequity, however, against other considerations that it believes are relevant in rate-setting and has therefore not regarded the elimination of the disparities or their shrinkage to *de minimis* as a paramount imperative. The issue raised is whether that approach is legally sound— whether State or Federal law makes it a paramount imperative.

From the beginning, it was clear that the PSC law did not require a single rate applicable to all classes of service. *See Penna. R.R. Co. v. Public Ser. Com.*, 126 Md. 59, 94 A. 330 (1915), *aff'd Pennsylvania R. Co. v. Towers*, 245 U.S. 6, 38 S.Ct. 2, 62 L.Ed. 117 (1917), affirming a PSC order that treated commuter fares differently than single rate fares and passenger rates differently than freight rates. In *Pub. Serv. Commn. v. United Rwys. Co.*, 155 Md. 572, 142 A. 870, *appeal dismissed*, 278 U.S. 567, 49 S.Ct. 79, 73 L.Ed. 510 (1928), the Court rejected an attempt by the utility to challenge the fare allowed on one line of its trolley service as confiscatory. At 606, 142 A. 870, it observed that "[n]aturally some parts of the company's system are more profitable than others, but that does not make it necessary

to establish different fares for the different lines." Instead, the Court looked to see if the overall rate of return was reasonable; if it was, the Court held, the fare allowed on one line would not be confiscatory, "for any loss occasioned [by that fare] is absorbed by the increased fares and does not in theory affect the rate of return...." *Id.* at 605–06, 142 A. 870. The practical effect of these cases is not substantially different from what we now have before us: one group or class of customer received service at a per unit rate less than that charged to other classes. At least in the *United Railways* case, if not in the *Pennsylvania Railroad* case, that difference could not be justified solely on the basis of differences in the cost of providing the service.

A better articulation of the principle allowing this kind of disparity came in *Lewis v. M. & C. C. of Cumberland*, 189 Md. 58, 54 A.2d 319 (1947). The issue there was whether water rates established by a municipal water works, outside the jurisdiction of the PSC, were unfairly discriminatory because of a minimum charge that, as applied, had apartments with separate meters paying more for water service than apartments that were not separately metered. Because the rates were not subject to PSC jurisdiction, the Court applied the common law. In that regard, the Court held, at 67–68, 54 A.2d 319:

> "The common law, like present day statutes, required that public utility rates be reasonable, but delegated no power to determine for the future what is reasonable.... The law implies a reasonable compensation, measured by what is ordinarily charged for like services under like conditions—a measure difficult to apply by finding evidence of like services under like conditions.... Both the common law and English and American statutes forbade either excessive rates or unjustly discriminatory rates for like services under like conditions. Neither the common law nor the statutes forbade reasonable classification of rates or discrimination which is not unjust but is reasonable in view of substantial differences in services or in conditions of service.... *Both the common law and*

> *statutes permit, but ordinarily do not require, classification of rates with regard to differences in cost of service and other considerations."*

(Emphasis added.)

As we have observed, the PSC has expressly recognized and identified other factors than cost alone that are appropriate to consider in setting class rates. The Maryland case law, at least in general terms, permits the use of the value of service technique and does not require differential rates to be tied entirely to cost of service. The italicized language from *Lewis* seems to make that clear. Other courts, writing more recently, have been even more explicit in approving that approach. Indeed, when dealing with rate-setting at the retail level by State public service commissions, that is the nearly universal approach.

An excellent compendium of the case law up to 1979 may be found in *Midwest Gas Users Ass'n v. State Corp. Com'n*, 3 Kan.App.2d 376, 595 P.2d 735 (1979), where, 595 P.2d at 741, the Court concluded:

> "Our reading indicates that the debate over cost-of-service versus value-of-service has been the concern of utility executives, regulators, engineers, and economists....
>
> As affecting rate design, the competing arguments have been directed to regulatory agencies with varying results; *when directed to courts, the idea that cost of service data is legally required has been universally rejected."*

(Emphasis added.)

In that case, which involved the rates of a gas utility, interruptible (industrial) customers, having a demonstrably lower cost of service than firm (residential) customers, complained because a rate increase was spread uniformly over all customers, thereby producing a larger percentage increase in rates for them. They demanded that the percentage increases be uniform, which, if required, would be necessitated only by a cost of service approach. The Court

rejected that argument, concluding, in the end, that "[t]he fact, if it be so, that the Company will derive a higher rate of return from its sales to interruptibles than its sales to firm customers does not make the rate schedule unjust or unreasonable." *Id.* at 747.

Courts in Florida, Ohio, Massachusetts, Minnesota, New Hampshire, New Mexico, Pennsylvania, Wisconsin, Wyoming, and the District of Columbia have taken a similar approach and approved differential rate schedules based on factors other than cost of service. *See* cases cited in *Midwest Gas Users Ass'n, supra,* 595 P.2d 735; also *U.S. Steel Corp. v. Pa. Public Utility Com'n,* 37 Pa.Cmwlth. 173, 390 A.2d 865 (1978); *Bldg. Owners & Managers v. Pa. Public Util.,* 79 Pa.Cmwlth. 598, 470 A.2d 1092, 1097 (1984); *Gen. Services Admin. v. Public Service Com'n,* 469 A.2d 1238 (D.C.App.1983); *Reserve Mining v. Minn. Public Utilities Com'n,* 334 N.W.2d 389 (Minn.1983); *Great Western Sugar Co. v. Johnson,* 624 P.2d 1184 (Wyo.1981). In *U.S. Steel Corp., supra,* 390 A.2d at 873, the Pennsylvania Court, adopting the reasoning of its Public Utility Commission, described the principles applicable to the fixing of rate schedules:

" 'There is no requirement that rates for different classes of service must be either uniform or equal or that they must be equally profitable. Differences in rates between classes of customers based on such criteria as the quantity of electricity used, the nature of the use, the time of the use, the pattern of the use, or based on differences of conditions of service, or cost of service are not only permissible but often are desirable and even necessary to achieve reasonable efficiency and economy of operation. Rate structure, which is an essential, integral component of rate-making, is not merely a mathematical exercise applying theoretical principles. Rate structure must be based on the hard economic facts of life and a complete and thorough knowledge and understanding of all the facts and circumstances which affect rates and services; and the rates must be designed to furnish the most

efficient and satisfactory service at the lowest reasonable price for the greatest number of customers, i.e., the public generally.' "

Many, if not most, State public service commissions have rejected a strict cost of service approach and have permitted disparities among class rates of return based on factors other than cost. *See Re Northern Indiana Public Service Company*, 96 PUR 4th 267 (Ind.URC 1988); *Re Incentive Rates for Electric Service*, 82 PUR 4th 624 (Or.PUC 1987); *Re Narragansett Electric Company*, 57 PUR 4th 120 (R.I.PUC 1983).

We believe that Maryland law is consistent with that approach and therefore follow it. The only statutory imperative is to construct and approve just and reasonable rates, and, as § 69(a) of article 78 makes clear, those are rates which, among other things, "fully consider and are consistent with the public good." That allows the Commission to consider and use factors other than pure cost of service. It does not require uniformity and does not require any specific formula or band of reasonableness.

■ As we indicated, BOMA also contends that the disparity in rates violates its members' right to equal protection of the laws. Precisely, it avers that "[a]t the Federal level the Courts have also ruled that the discrimination in electrical rates is illegal," citing as authority for that statement *FPC v. Conway Corp.*, 426 U.S. 271, 278, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626 (1976); *Alabama Elec. Co–Op, Inc. v. F.E.R.C.*, 684 F.2d 20 (D.C.Cir.1982); *City of Frankfort, Ind. v. F.E.R.C.*, 678 F.2d 699 (7th Cir.1982); and *Public Serv. Co. of Ind. v. F.E.R.C.*, 575 F.2d 1204 (7th Cir.1978).

These cases do not stand for the Constitutional proposition asserted by BOMA. They each involved rates approved by the Federal Power Commission or its successor, the Federal Energy Regulatory Commission. That Commission, whose rate-making jurisdiction is limited to the sale of power at the wholesale level, has adopted a different view

than the State commissions, which regulate retail rates, and so have the Federal courts when interpreting the Federal Power Act and reviewing FERC decisions. As noted in *Alabama Elec. Co-Op, Inc., supra,* 684 F.2d at 27:

> "While neither statutes nor decisions of this court require that the Commission utilize a particular formula or a combination of formulae to determine whether rates are just and reasonable, it has come to be well established that electrical rates should be based on the costs of providing service to the utility's customers, plus a just and fair return on equity. FERC itself has stated that '[i]t has been this Commission's long standing policy that rates must be cost supported. Properly designed rates should produce revenues from each class of customers *which match, as closely as practicable, the costs to serve each class or individual customer.'* "

(Emphasis added by the U.S. Court of Appeals.)

None of the cases cited purports in any way to hold that a cost of service approach or any specific zone of reasonableness is required by the equal protection clause. Indeed, that argument has generally been rejected where made. *See Hansen v. City of San Buenaventura,* 42 Cal.3d 1172, 233 Cal.Rptr. 22, 729 P.2d 186, 196–97 (1986); *Allied Chem. Corp. v. Ga. Power Co.,* 236 Ga. 548, 224 S.E.2d 396 (1976); *Georgia Retail Ass'n v. Georgia Pub. Service,* 165 Ga.App. 208, 300 S.E.2d 544 (1983); *Village Green of Lansing v. Board of Water,* 145 Mich.App. 379, 377 N.W.2d 401 (1985); *Colony Park Apartments v. Public Service,* 155 Mich.App. 134, 399 N.W.2d 32 (1985); *Robert Randall Co. v. City of Beaverton,* 68 Or.App. 419, 682 P.2d 818 (1984); *Great Western Sugar Co. v. Johnson, supra,* 624 P.2d 1184. In considering the equal protection argument, these courts have applied the rational basis test and concluded, for essentially the same reasons that allow a value of service approach under State law, that rate disparities among classes based on legitimate factors other than cost are not unreasonable.

For these reasons, we find no error in the rejection of BOMA's attack on the rate structure.

## The Two–Step Approach

We turn now to People's Counsel's complaint about the procedure employed by the PSC.

In the course of the proceeding, BG & E proposed a three-step phase-in of the costs associated with the BSU–2 unit, its intent being to introduce those costs into the rate structure gradually rather than all at once. Evidence offered by it indicated that, under traditional rate-making principles, the costs arising from BSU–2 would justify a $124 million rate increase in June, 1991, offset in part by a $52 million saving in fuel cost and thus reflecting a net need for $72 million. It suggested an immediate increase of $45 million to recover $333 million of the BSU–2 capital costs; a second increase in June, 1991 of $52 million, to recover an additional $167 million in BSU–2 capital costs, that increase to be offset entirely by the $52 million of fuel cost saving; and a third increase in January, 1992 of $32 million, to allow a return on its full investment as well as certain remaining operating costs. The phase-in approach was premised on the acknowledged fact that, as BSU–2 would be coming on-line within five or six months after the conclusion of the general rate case, unless the costs associated with that unit were considered, the rates approved by the PSC would very quickly become unjustly and unreasonably low and therefore be in need of immediate adjustment.

People's Counsel objected to the plan proposed by BG & E and insisted that any request for a rate increase based on costs associated with the operation of BSU–2 be considered in a separate rate case. His concern was that rates are ordinarily based on the overall results of a test year, that the test year used in the current case would end ten months before BSU–2 was expected to begin operation, that none of the costs associated with that operation could therefore be reflected in the test year, and that, to the extent those costs could be estimated, they should be considered in conjunction

with all other aspects of BG & E's operations after the commencement of the unit's operation. His expert witness, Kenneth Gallagher, supported that approach.

The Commission staff made a third recommendation—that the revenue requirements associated with the BSU–2 operation be met through a surcharge imposed after the unit commenced operation. Three alternative methods of calculating the surcharge were proposed by its expert witness. Finally, a witness for intervenor General Motors Corp. suggested a fourth approach—a deferred accounting method that would allow BG & E to record a deferred return on its investment after BSU–2 began operation, to add the deferred amounts to its rate base in the next rate case, and to allow the company to amortize those amounts over the life of the plant. None of the parties, it seems, was enamored with any approach other than the one sponsored by it, and all approaches were roundly criticized by one party or another.

The Commission gave careful consideration to all four approaches. It noted at the outset of its discussion that, when a base load plant enters commercial operation "there is an immediate, substantial increase in revenue requirements to provide for recovery of capital, depreciation, and operation and maintenance expenses" and that the Commission "must permit BG & E an opportunity to recover this increase through rates as long as BG & E shows that the costs are reasonable and the plant is necessary to serve the needs of customers." It observed as well that "[n]o party challenges the capital cost associated with the construction of BSU–2 or the need for the plant to accommodate new residential, commercial and industrial growth as well as increased energy consumption by existing customers." The principal issue, it declared, "concerns the timing and method of recovering the increased revenue requirements associated with BSU–2 becoming used and useful."

The Commission, in the end, rejected all of the proposals put forth by the parties and opted instead for a two-step approach. It said in that regard:

"After carefully considering the evidence and argument on the issue of Brandon Shores, we reach two primary conclusions. First, we find that it is in the public interest to reflect in rates both the costs of BSU-2, and the projected fuel cost savings, in a timely fashion. Second, we conclude that a step rate approach, with the revenue requirements and updated billing determinants of Staff's second method, is the best way to reflect BSU-2 costs in base rates.

We define timely here as coincident with the date of commercial operation, now estimated at June 1, 1991. Some argue that we should wait until BG & E files a new base rate case to consider the issues. *But since most facts about BSU-2 are known and certain at this time, a full rate case, whether expedited or not, is unnecessary.* Also, because we will order a revision in the fuel rate when BSU-2 goes into service, it is only appropriate to reflect the costs that produce those savings at the same time.

In reaching this decision, the Commission observes that the evidence in this proceeding is clear that the capital costs of BSU-2 are reasonable. The plant, which is substantially complete, will cost about $662 million, or $1,031 per KW, nearly 20 percent less than a typical coal-fired plant of that size. Next, no one disputes BG & E's testimony about the need for this unit, which is not surprising, given recent load growth. Finally, the record is uncontradicted that BG & E's management of the BSU-2 project was prudent. *With few facts left to determine, the creation of a separate and expensive proceeding, we believe, would be unnecessary and not in the public interest.*"

(Emphasis added.)

Having made that determination, the Commission considered and rejected various proposals for phasing in the BSU-2 costs. Instead, it authorized BG & E to file revised tariffs, along with a revised fuel rate, when the BSU-2 unit

entered service, on or about June 1, 1991. Those new rates would be contingent, however, on three things:

"First, BG & E must show that, absent a rate adjustment, it will be otherwise unable to earn its authorized return. That showing must be made in the manner that was recommended by Staff, based on the March 31, 1991 quarterly report, the most recent data available before the in-service date. Second, if operating results indicate that BG & E has been earning more than its authorized return, but not enough to absorb the BSU–2 revenue requirement, the rate adjustment will be limited to a level of revenue requirements that provide the Company an opportunity, prospectively, to earn at the level of its authorized return, rather than the full amount of BSU–2 revenue requirement. Finally, BG & E must furnish the data that is necessary to calculate the revenue requirement, which should not vary in any significant way from the evidence in this case."

The final decision by the Commission relevant to this appeal was its statement:

"BG & E shall file the required BSU–2 information and tariffs with the Commission and all parties to this case in a timely fashion. We expect that review will be similar to that which occurs upon a compliance filing. We also expect to consider the filing at an administrative meeting, at which all parties will have an opportunity to express their views as to whether there is compliance with this Order."

On April 29, 1991, BG & E filed with the Commission a supplement revising its tariffs, to become effective May 28, 1991. Appended to that supplement were the company's March 31, 1991 quarterly report and a number of appendices documenting compliance with the conditions established by the Commission in its December, 1990 order. Specifically, BG & E showed that it was not then earning its authorized rate of return and that the inclusion of the revenue requirement for BSU–2, which it calculated, would not improve the system rate of return. It proposed to

768

reduce the fuel rate by $58 million and included supporting data documenting that adjustment. People's Counsel, who received a copy of the filing, protested the Commission's considering the filing at an administrative meeting and insisted again that the matter be taken up in a separate rate hearing. He offered no comment on or objection to any of the data supplied by BG & E and did not contest that the filing was in compliance with the December order or assert that the conditions laid down in that order were not met. As noted, the Commission, at an administrative meeting, determined that the filing was in compliance with the order and therefore permitted the revised tariffs to take effect May 28, 1991.

In challenging this approach, People's Counsel accuses the Commission of being arbitrary and capricious, of abusing its discretion, of acting without substantial evidence, of ignoring long-standing principles of public utility regulation, and of forcing consumers to pay rates that are neither just nor reasonable. The thrust of his complaint is that, in traditional rate-making, the Commission ordinarily looks only at events and operations occurring during the test year and will consider later events or adjustments only if those events are known and certain and occur contemporaneously with the Commission's decision. That allows the Commission to look at all aspects of the utility's operation in context. Here, he complains, the Commission approved in advance an enormous increase in rates based on an event that occurred ten months after the close of the test year and five months after its December, 1990 order, without allowing an evidentiary hearing to consider the overall operation of the company after BSU–2 came into service. In short, he presses his argument that, given the enormity of the addition and the lag time between the end of the test year and the commencement of operation of BSU–2, the revenue requirements of that additional plant needed to be addressed in a separate rate case. The procedure used by the Commission, he urges, amounts to a single issue rate case, which is improper. Moreover, approval of the step-

two filing at an administrative meeting, without opportunity for an evidentiary hearing, he argues, denied ratepayers due process of law.

In support of his argument, People's Counsel relies principally on *Scates v. Arizona Corp. Commission*, 118 Ariz. 531, 578 P.2d 612 (App.1978) and *In Re Cons. Rate App. of Green Mt. Power Corp.*, 142 Vt. 373, 455 A.2d 823 (1983), which, he says, declare illegal the granting of rate increases based on only one adjustment. Those cases are really not on point. In *Scates*, 10 months after a full rate case, the Arizona Corporation Commission approved an application by the telephone company for a $5 million increase in charges for installing, moving, and changing telephones. The application was based on an assertion that the company was not recovering its cost *for those services*. In reversing the Commission, the court observed that the Commission had approved the increase without any examination of the utility's other costs, without any determination of its investment, and without any inquiry as to the effect of the increase, constituting about 2% of its gross revenues, on its rate of return. That is what it found improper.

The Vermont case arose from a series of rate cases filed in response to the abnormal inflation that occurred in the late 1970's. The electric utility had five rate cases in less than two years. One of its complaints was that the Public Service Board rejected its request for what the court referred to as "selective updating," i.e., adjusting test year results to reflect one cost factor that would occur outside the test year. The court affirmed the Board, noting that the selective updating requested by the utility "will not adjust the test period to reflect typical conditions." 455 A.2d at 827. Moreover, because the company had another full rate case pending, such "updating for future rate use was unnecessary." *Id.* at 828.

We are not dealing with those kinds of situations here. As the PSC pointed out in its order, most of the data pertaining to the cost of BSU–2 and the revenue requirements and fuel cost reductions that would arise from it

were considered in the present case. Indeed, there was little dispute about those matters. The unit was to begin operation five months after the Commission's order, and so these costs were not only ascertained but certain to occur within a relatively short time. The impact of those costs on BG & E's overall operation, on its investment in plant, and on its rate of return was fully considered by the Commission. The only item which People's Counsel contends was *not* considered was the extent to which the placement into service of BSU–2 might increase sales of electricity beyond those reflected in the test year. That, indeed, seems to be the focus of People's Counsel's attack.

As the Vermont case points out, although the use of a test year is a standard and acceptable procedure in rate-setting, equally standard and acceptable is the making of adjustments to test year results to reflect significant changes that are certain to occur during the period the approved rates will be in effect. Other courts have also approved that approach, and, in *Balto. Gas Co. v. McQuaid*, 220 Md. 373, 152 A.2d 825 (1959), the Court of Appeals, at least inferentially, approved it as well. There too, the company was faced with the need to expand its plant and the question arose as to how to deal with the cost of those additions. At 382, 152 A.2d 825, the Court held that the Commission could deal with the problem in various ways, one being to use a test year that would not end until after the rate case had concluded. That would necessarily involve estimating the impact of selected future events. Moreover, at 384–85, 152 A.2d 825, the Court cited with approval a number of out-of-State cases in which courts permitted future additions to property to be considered in setting rates.

There are, to be sure, limits on the Commission's ability to consider a plant not currently in operation in setting rates. Section 69(a) requires that the utility's rate of return be on the fair value of the company's property *"used* and useful in rendering service to the public." (Emphasis added.) That requires some measure of certainty that the

property, if not currently in use, will in fact be coming into use shortly; it also requires, as People's Counsel asserts, that the Commission consider the full impact of that property on the company's operations, just as it needs to do with respect to property currently in use. We disagree with People's Counsel's contention that this was not done in this case.

■ The Commission had before it the assertion by People's Counsel's expert witness that, if the Commission were to consider the revenue requirements of BSU-2, it would need also to make an adjustment to the sales figures: "Absent any recognition of the increased revenues that are likely to be realized when the unit is fully in-service, a serious mismatch is created and thereby presents a distorted view of the revenue requirements associated with the [BSU-2]." It concluded, however, that it normally does not make predetermined sales adjustments in connection with a new plant in electric rate cases and that there was no need to do so in this case. In that regard, it distinguished another case, *Re Potomac Electric Power Company*, 78 Md. PSC 168 (1987), where the data showed a "stunning 7.7 percent" sales growth. "In contrast," the Commission noted, "there is no evidence here of such robust growth in sales, either actual or forecasted." In fact, the Commission had before it projections of BG & E revenue through 1991.

After considering the arguments on this issue, the Commission decided that, instead of making a predetermined sales adjustment, it would consider the company's first quarter 1991 earnings before approving the step-two increase, and that is what, in fact, it did. BG & E was required to attach and did attach its March, 1991 quarterly report to its compliance filing.

Under the circumstances in this case, we find no error in the Commission's approach—either in the two-step procedure or in refusing to consider a pre-determined sales adjustment. This kind of procedure was considered in the rate case and all parties had the opportunity to present

their views concerning it. The Commission took into account the full impact of BSU–2 and, to make certain that the basis for its decision did not become outmoded, conditioned the step-two increase on a further finding that the up-to-date data to be submitted by BG & E with its compliance filing was consistent with the evidence in the rate case. As noted, no one claimed that it was not. We cannot conclude that the Commission abused its discretion or acted unlawfully in not requiring an entire new rate case simply to consider an impact that already had been measured and considered.

JUDGMENT AFFIRMED; COSTS TO BE PAID ONE–HALF BY PEOPLE'S COUNSEL, ONE–HALF BY BOMA.