795 A.2d 160

**MID–ATLANTIC POWER SUPPLY ASSOCIATION**

v.

**MARYLAND PUBLIC SERVICE COMMISSION et al.**

**No. 1931, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

April 1, 2002.

422

Thomas W. Kinnane (Jennifer Shuck Baldwin and Howes & Kinnane, on brief), Annapolis, for appellant.

Susan Stevens Miller, Baltimore, for appellee, Public Service Com'n.

Deborah E. Jennings (Brett Ingerman and Piper, Marbury, Rudnick & Wolfe, LLP, on the brief), Baltimore, for appellee B G &E.

William F. Fields, Asst. People's Counsel (Michael J. Trafieso, People's Counsel and Sandra M. Guthorn, Deputy People's Counsel, on the brief), Baltimore, for appellee, People's Counsel.

Argued before SONNER, DEBORAH S. EYLER, and KRAUSER, JJ.

KRAUSER, Judge.

The principal issue before us is whether the electric restructuring plan of the Baltimore Gas and Electric Company ("BGE") violates the Electric Customer Choice and Competition Act of 1999, §§ 7–501, et seq. of the Public Utility Companies Article ("PUC") of the Maryland Code Annotated (1998, 2000 Supp.)("Act").[1] The Maryland Public Service Commission ("Commission") determined that it did not. And that decision was subsequently affirmed by the Circuit Court for Baltimore City.

At the time that the Commission reviewed the BGE restructuring plan, it was part of the Stipulation and Settlement Agreement ("Agreement") reached by co-appellees BGE, the Maryland Office of People's Counsel ("OPC"), the Commission, and other interested public and private parties ("Settling Parties").[2] Not all interests, however, were parties to that agreement.

Appellant, Mid–Atlantic Power Supply Association ("MAPSA"), a trade association for wholesale and retail electric supply companies in the mid-Atlantic area, declined to sign the

---

1. The Act has not heretofore been the subject of judicial scrutiny.

2. Other parties to the Agreement include: Maryland Department of Natural Resources Maryland Energy Administration and The Power Plant Research Program; Johns Hopkins University and Johns Hopkins Health System Corporation; Board of County Commissioners of Calvert County, Maryland; Department of Defense/Federal Executive Agencies; Maryland Retailers Association; Building Owners and Managers Association of Baltimore, Inc.; Maryland Industrial Group and Millennium Inorganic Chemicals, Inc.; National Railroad Passenger Corporation (Amtrak); Enron Energy Services, Inc.; and the staff of the Maryland Public Service Commission.

Agreement. Instead, it challenged the Agreement—first before the Commission and then, after the Commission approved the Agreement, before the Circuit Court for Baltimore City, claiming that the Agreement violated the Act and did not promote competition among electricity suppliers. Before both the Commission and the circuit court, appellant questioned the provisions of the Agreement that granted BGE $528 million in stranded costs, that permitted BGE to grant its residential customers a 6.5% rate reduction over six years, that allocated 68% of that 6.5% residential rate reduction to BGE's generating assets, that allocated BGE's transition costs to residential customers, and that permitted BGE to transfer its generating assets to its unregulated affiliates at book value. Failing to persuade either tribunal of the justice of its cause, appellant noted this appeal.

At the core of this appeal lie two orders of the Commission. The first order ("Settlement Order" or "Order No. 75757") approved the Agreement, while the second order ("Letter Order"), pursuant to the Agreement, authorized the transfer of BGE's generating assets to its unregulated affiliates. Challenging these orders on appeal, appellant presents nine issues, which we have reworded and consolidated into eight issues for our review. Those eight issues are:

1. Whether the circuit court applied the correct standard of review in upholding the Commission's Settlement Order.

2. Whether the circuit court erred in holding that the Commission's adoption of $528 million in stranded costs was well-reasoned, articulate, supported by substantial evidence and in compliance with PUC § 7–513(e).

3. Whether the circuit court erred in holding that the Settlement Order properly defers the establishment of a market power proceeding to consider market power issues affecting BGE's service territory until such time as a party files a formal complaint with the Commission.

4. Whether the circuit court erred in holding that the Settlement Order does not violate PUC § 7–505 by provid-

ing a residential rate reduction of 6.5% over a six year period.

5. Whether the circuit court erred in holding that the allocation of 68% of a 6.5% residential rate reduction to BGE's generating assets in the Settlement Order does not violate PUC § 7–504.

6. Whether the circuit court erred in holding that the Settlement Order does not improperly allocate transition costs to residential customers.

7. Whether the circuit court erred in upholding the Commission's Letter Order approving BGE's transfer of its generating assets to its unregulated affiliates at book value.

8. Whether the Commission lacked jurisdiction to approve the transfer of BGE's generating assets while the Settlement Order was being appealed.

For the reasons that follow, we conclude that the circuit court did not err in holding that the Commission's Settlement Order and Letter Order satisfied the statutory requirements of the Act. We further hold that MAPSA's appeal of the Settlement Order did not divest the Commission of jurisdiction to approve the Letter Order authorizing the transfer of BGE's generating assets to it's unregulated affiliates. Consequently, we shall affirm the judgment of the circuit court.

## The Act

The Maryland electric industry provides three main services: 1) the generation of electricity; 2) the transmission of electricity to distribution networks; and 3) the distribution of electricity to customers. The Act deregulates the generation of electricity but not the transmission and distribution of electricity. Under the Act, customers will be able to choose their electricity supplier, while the transmission and distribution of electricity will still be provided by their local utilities. The purpose of the Act, is to "(1) establish customer choice of electricity supply . . .; (2) create competitive retail electricity supply . . .; (3) deregulate the generation, supply, and pricing of electricity; (4) provide economic benefits for all customer

classes; and (5) ensure compliance with federal and State environmental standards." PUC § 7–504(1)(5). The Act's enhancement of consumer choice will presumably apply competitive pressure on market prices, and allow competition, instead of regulation, to police the market power of utilities.

To achieve these goals, the Act creates a comprehensive legal framework for restructuring the electrical industry with, among other things, price protection mechanisms, provisions for the transfer of generating assets to unregulated affiliates, and rules governing the treatment of transition costs associated with deregulation. The Act directs the Commission to

provide that the transition to a competitive electricity supply and electricity supply services market shall be orderly, maintain electric system reliability, and ensure compliance with federal and State environmental regulations, be fair to customers, electric company investors, customers of municipal electric utilities, electric companies, and electricity suppliers, and provide economic benefits to all customer classes.

PUC § 7–505(a)(1).

### Procedural History

On July 1, 1998, before the passage of the Act, BGE outlined its restructuring plan in an application it filed with the Commission, seeking approval of certain transition costs and price protection mechanisms (Case No. 8794).[3] In response, OPC petitioned the Commission to reduce the energy rates proposed by BGE in that plan (Case No. 8804). After consolidating these two cases, the Commission granted the request of appellant and other interested parties to intervene in the consolidated case.

Before the hearing on BGE's requests, BGE and OPC, together with other interested parties, filed a Stipulation and Settlement Agreement ("Agreement") with the Commission. As noted earlier, appellant declined to sign the Agreement,

---

**3.** BGE's application, docketed as Case No. 8794, was filed in response to Commission Order No. 73834 which directed BGE to submit a restructuring plan.

claiming that it did not comport with the Act and failed to promote a competitive market for electricity suppliers. Notwithstanding appellant's objections, the Commission approved and adopted the Agreement in Order No. 75757 (the "Settlement Order") on November 10, 1999.

The Agreement provides that, starting July 1, 2000, retail customers of electricity suppliers will have the opportunity to select their own supplier of generated power. The Agreement "unbundles" or separates the rates BGE charges for generating electricity from the rates it charges for transmitting and distributing electricity and thereby permits customers to compare generation rates charged by different electricity suppliers.

To insulate these customers from possible rate instability during this transition period, the Agreement gives certain residential and non-residential customers the option to retain BGE as their electricity supplier under a Standard Offer Service ("SOS")[1] through June 30, 2006. Until July 1, 2003, BGE "will have the discretion to arrange for generation service for its SOS customers." Thereafter, BGE is required to obtain generated electricity through a competitive bidding process.

In addition, the Agreement provides for a six-year 6.5% rate reduction for most residential customers.[5] Rates for non-residential customers, although not subject to the 6.5% residential rate reduction, will be frozen on June 30, 1999 for four years. The purpose of these rate caps is to protect customers, during the transition to a deregulated electric industry, against the volatility of a competitive marketplace.

Incorporated into these rates is a Competitive Transition Charge ("CTC"), which will allow BGE to recover "stranded

---

4. The Standard Offer Service gives BGE's customers the option to use BGE as their supplier of electricity "at set prices" for a limited period of time.

5. For large residential customers, the rate reduction will be for a period of four years.

costs." "Stranded costs"—or as they are referred to in the Act "transition costs"—represent the difference between the net book value and the fair market value of BGE's generating assets that will ultimately be transferred, pursuant to the Settlement Order, to its unregulated affiliates. To recoup those costs, BGE is entitled, under the Agreement, to recover $528 million dollars in stranded costs through the CTC.[6]

In approving the Agreement, the Commission concluded that it was in the public interest, comported with the requirements of the Act, and provided for a sensible transition to a competitive electric market. The Commission also found that the transfer of BGE's generating assets would "deregulate the generation, supply and pricing of electricity provided to BGE's customers."

On December 10, 1999, appellant filed both a petition for judicial review and a motion to stay the Settlement Order in the Circuit Court for Prince George's County; this matter was then transferred to the Circuit Court for Baltimore City. Upon transfer of the case, appellant amended its motion to stay by adding specific requests to stay certain portions of the Settlement Order. Those portions included the Commission's "acceptance" of the $528 million stranded cost recovery, the proposed CTC option process for commercial and industrial customers, the separation of the stranded cost valuation process from the asset transfer process, the use of book values in the transfer process, the six-year residential rate cut, the allocation of the rate cut to generation service, the deferral of a market power proceeding, and the collection of the CTC from customers based on the stranded cost recovery amount.

In response to appellant's petition and motion, BGE filed a motion requesting summary judgment on the ground that appellant lacked standing to contest the Commission's decision. Notwithstanding appellant's pending petition for judicial

---

**6.** The Settlement Order provides that, despite BGE's recovery of stranded costs, customers will receive the rate reductions outlined above. Stranded cost recovery does not reduce the scheduled rate reductions and is under the price caps.

review, BGE also filed an application to transfer its generating assets to its unregulated affiliates in accordance with the Settlement Order. The circuit court ultimately granted BGE's motion for summary judgment, holding that appellant, as an association, lacked standing to bring such an action and denied its motion to stay portions of the Settlement Order.

After noting an appeal to this Court, appellant once again moved for a stay of the Settlement Order in the circuit court, this time, on the ground that the appeal it had noted was pending. When that motion was also denied, appellant filed a motion in this Court, requesting injunctive relief, and a petition for a writ of certiorari in the Court of Appeals, requesting review of the "standing" issue and a stay of the Settlement Order. Although this Court denied appellant's request for injunctive relief, the Court of Appeals granted its petition for a writ of certiorari and stayed the implementation of the Settlement Order.

Shortly thereafter, the Commission held an "administrative meeting" to address the proposed transfer of BGE's assets. At that meeting, appellant and Shell Energy, LLC ("Shell") opposed the transfer, arguing that the Commission lacked jurisdiction to hear this matter because the circuit court had assumed jurisdiction by accepting appellant's petition to review the Settlement Order. Rejecting that argument, the Commission approved the transfer of BGE's generating assets to its unregulated affiliates and issued a Letter Order dated June 19, 2000, authorizing that transfer.

MAPSA and Shell then filed a joint petition for judicial review in the Circuit Court for Baltimore City, seeking review of the Letter Order. In an opinion dated September 20, 2000, the circuit court affirmed both the November 10, 1999 Settlement Order and the June 19, 2000 Letter Order approving the transfer of BGE's generating assets to its unregulated affiliates. Thereafter, the Court of Appeals held that appellant had standing to seek judicial review in this matter, and appellant noted this appeal.

## Scope of Review

The scope of review for decisions of the Commission is set forth in PUC Article § 3–203. That section states:

Every final decision, order, or regulation of the Commission is prima facie correct and shall be affirmed unless clearly shown to be: (1) unconstitutional; (2) outside the statutory authority or jurisdiction of the Commission; (3) made on unlawful procedure; (4) arbitrary or capricious; (5) affected by other error of law; or (6) if the subject of review is an order entered in a contested proceeding after a hearing, the order is unsupported by substantial evidence on the record considered as a whole.

Because a final decision of the Commission is prima facie correct, it "will not be disturbed on the basis of a factual question except upon clear and satisfactory evidence that it was unlawful and unreasonable." *Office of the People's Counsel v. Maryland Public Service Commission,* 355 Md. 1, 14, 733 A.2d 996 (1999). Indeed, if reasoning minds could reasonably reach the Commission's decision from the facts in the record, then the decision is based upon substantial evidence, and we will not reject that conclusion. *Liberty Nursing Center, Inc. v. Department of Health and Mental Hygiene,* 330 Md. 433, 442–43, 624 A.2d 941 (1993).

Finally, in reviewing a decision of an agency, our role "is precisely the same as that of the circuit court." *Department of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–04, 641 A.2d 899 (1994). Consequently, we "do not evaluate the findings of fact and conclusions of law made by the circuit court." *Consumer Protection Division v. Luskin's, Inc.,* 120 Md.App. 1, 22, 706 A.2d 102 (1998), *rev'd in part on other grounds,* 353 Md. 335, 726 A.2d 702 (1999). This Court is not concerned with whether the circuit court applied the correct standard of review so long as we are satisfied that the agency decision is proper. *Giant Food, Inc. v. Department of Labor, Licensing and Regulation,* 124 Md.App. 357, 363, 722 A.2d 398 (1999), *rev'd on other grounds,* 356 Md. 180, 738 A.2d 856 (1999).

## Discussion

### I.

### (Issue 1)

 Appellant contends that the circuit court applied the wrong standard of review in affirming the Commission's Settlement Order. According to appellant, the circuit court erred in rejecting the standard of review set forth in *Colao v. County Council of Prince George's County,* 109 Md.App. 431, 675 A.2d 148 (1996), *aff'd,* 346 Md. 342, 697 A.2d 96 (1997), in favor of the standard of review promulgated in *Insurance Commissioner v. National Bureau of Cas. Underwriters,* 248 Md. 292, 236 A.2d 282 (1967). In support of that claim, appellant cites the following language from the opinion of the court below:

> This Court believes that neither the *Colao* decision nor the other federal agency cases are directly on point. Maryland's appellate courts have had repeated opportunities to define the scope of judicial review of PSC and other state agency rulings and those decisions consistently return to Chief Judge Hammond's articulation in *Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 236 A.2d 282 (1967).

In *Colao,* we were asked to determine, among other things, whether the decision of the county council, sitting as a district council, approving two zoning applications was supported by substantial evidence and, more importantly for our purposes, whether the council, in rendering its decision "sufficiently articulated its findings of fact and conclusions of law." *Colao,* 109 Md.App. at 453, 675 A.2d 148. We held that it did not and reversed the decision of the circuit court, stressing that "without well-reasoned and articulated administrative findings . . . a reviewing court may not uphold an agency's decision." *Id.* at 454, 675 A.2d 148 (citing *Mortimer v. Howard Research & Dev. Corp.,* 83 Md.App. 432, 441, 575 A.2d 750 (1990)).

*Insurance Commissioner v. National Bureau,* on the other hand, involved appeals by two insurance companies from the denial by the Insurance Commissioner of their applications for

rate increases. In that case, the Court of Appeals stated that "judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Insurance Comm'r,* 248 Md. at 309, 236 A.2d 282.

Despite the distinction the circuit court drew between the two cases, there are no grounds for concluding that they employed different standards of review. On the contrary, they applied the same standard of review but just stressed different aspects of it because of the factual differences between the two cases.

Indeed, there is no basis for suggesting that the *Colao* Court departed from the standard of review articulated in *Insurance Commissioner,* requiring that judicial review be confined to determining "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Id.* at 309–10, 236 A.2d 282. The *Colao* Court expressly adhered to that standard when, quoting *Columbia Road Citizens' Association v. Montgomery County,* 98 Md. App. 695, 698, 635 A.2d 30 (1994), it stated that, "[i]n regard to findings of fact, the trial court cannot substitute its judgment for that of the agency and must accept the agency's conclusions if they are based on substantial evidence and if reasoning minds could reach the same conclusion based on the record." *Colao,* 109 Md.App. at 458, 675 A.2d 148.

The *Colao* Court did stress the need for "specific findings and well-articulated conclusions" by the reviewing agency. *Id.* at 453, 675 A.2d 148. But that emphasis is understandable, as this Court was reviewing a zoning decision that appeared to simply adopt, without analysis, the findings and conclusions of a zoning hearing examiner. That practice had been the object of substantial criticism by the Court of Appeals. *See Montgomery v. Board of County Com'rs,* 256 Md. 597, 261 A.2d 447 (1970).

In any event, regardless of the comments of the court below, we hold, in the words of that court, that "the Settlement Order sufficiently sets forth the basis for its conclusions

and contains the required factual determinations." Indeed, the Commission began its opinion with a detailed description of the provisions of the Agreement and discussed at length the testimony provided by key witnesses in support of the Agreement, notably, David A. Brune, Vice President and Chief Financial Officer for BGE; Eugene T. Meehan, Vice President of National Economic Research Associates, Inc.; and Shelton Switzer, Director of BGE's Electric Pricing and Tariffs Unit. It also recounted the testimony of OPC witness Jonathan F. Wallach, Vice President of Resource Light, Inc., and the testimony of Matthew I. Kahal of Exeter Associates who testified on behalf of the Department of Natural Resources/Maryland Energy Administration ("DNR"). Wallach testified as to why the settlement was in the public interest. And Kahal described how the Agreement "fairly balances the interests of customers and BGE's investors and gave testimony as to the fairness and efficacy of various parts of the [Agreement]." Finally, the Commission summarized the testimony of Calvin L. Timmerman, Director of the Commission's Rate Research and Economics Division, in support of the Agreement and quoted from briefs submitted by the following supporters of the Agreement: Enron Energy Services, Inc., Maryland Retailers Association, Building Owners and Managers Association of Baltimore, Inc., Johns Hopkins University, and Board of County Commissioners of Calvert County.

The Commission also summarized the testimony and arguments presented by opponents to the Settlement, notably, appellant, Trigen Energy, Inc. and Statoil Energy Services Inc., as well as those with objections to specific parts of the Settlement, such as Bethlehem Steel Corp. and the City of Baltimore. It then reviewed each issue addressed by the Agreement, liberally drawing from the testimony adduced by both sides, while discussing in detail the evidence presented and the applicable law. In the course of reviewing each issue, the Commission made findings of fact and conclusions of law, which were later summarized at the conclusion of its opinion in a section entitled "Statement of Commission Findings." We are therefore unpersuaded by appellant's argument that the

Commission failed to make specific findings and to provide well-articulated conclusions.

## II.

### (Issue 2)

■ Appellant contends that the Commission erred in approving $528 million in stranded costs. As noted earlier, stranded costs represent the difference between the net book value and the fair market value of the BGE generating assets that are to be transferred to its unregulated affiliates pursuant to the Commission's Letter Order. To recoup those costs, as agreed by the Settling Parties, BGE is entitled to recover $528 million in stranded costs through a Competitive Transition Charge ("CTC"). Pursuant to the Settlement Order, the CTC will be incorporated into the rates charged to BGE customers.

■ Appellant claims that the approval of those costs was not supported by substantial evidence and did not meet the requirements of PUC § 7–513(e). That section provides, in part:

(1) In determining the appropriate transition costs or benefits for each electric company's generation-related assets, **the Commission shall:** (i) conduct public hearings; and (ii) **consider,** in addition to other appropriate evidence of value: 1. book value and fair market value; 2. auctions and sales of comparable assets; 3. appraisals; 4. the revenue the company would receive under rate-of-return regulation; 5. the revenue the company would receive in a restructured electricity supply market; and 6. computer simulations provided to the Commission.

(2) The Commission shall determine any equitable allocation of costs or benefits between shareholders and ratepayers. In determining the allocation of transition costs or benefits, the **Commission shall consider the following factors:** (i) the prudence and verifiability of the original investment; (ii) whether the investment continues to be used and useful; (iii) whether the loss is one of which

investors can be said to have reasonably borne the risk; and (iv) whether investors have already been compensated for the risk.

(Emphasis added).

Appellant asserts that the words "the Commission shall consider" in PUC § 7–513(e) requires the Commission to consider and discuss each of that subsection's enumerated factors before approving a stranded cost recovery. The Commission, appellant claims, failed to do so and, consequently, its decision to award $528 million in stranded costs does not rest upon substantial evidence.

In support of that claim, appellant relies upon *Ocean Hideaway Condominium Association v. Boardwalk Plaza Venture*, 68 Md.App. 650, 656, 515 A.2d 485 (1986). In that case, the issue before us was whether a local zoning board made the findings of fact that were required by a local zoning ordinance in approving a request to build a 17 story building at the Ocean City Boardwalk. That ordinance provided in part that the board " 'in its decision shall render a finding of fact on each of the nine (9) standards stated ... above.' " *Id.* at 655, 515 A.2d 485. It also provided that the board may grant a special exception if " 'in its opinion, ... such exceptions will not substantially affect adversely the uses of the adjacent and neighboring property.' " *Id.*

In reversing the board's decision, this Court stressed that "the Board states its conclusions under each of the nine categories without any factual findings whatsoever." *Id.* at 659, 515 A.2d 485. We observed that "[e]ach of the one sentence conclusions contains nothing more than a positive statement of each of the conditions precedent to the approval by the Board of the special exception." *Id.* We therefore concluded that the "citizens of Ocean City [were] entitled to more than the perfunctory disposition which the Board made of this important zoning case." *Id.* at 659–60, 515 A.2d 485.

Attempting to apply that reasoning to this case, appellant argues that the circuit court failed to adequately address the statutory factors of PUC § 7–513(e) "[g]iven the conclusory

(and incomplete) reference" to specific PUC § 7–513(e)(1) factors, and the "complete absence of reference to specific § 7–513(e)(2) factors." Because the Commission, according to appellant, "failed to analyze and consider each of these factors in detail," appellant urges this Court to reverse the decision of the circuit court and remand this matter for the development of an appropriate record. Given the differences between the governing regulation in *Ocean Hideaway* and the governing statute here, however, the applicability of *Ocean Hideaway* to the instant case is problematic.

The ordinance at issue in *Ocean Hideaway* required the zoning board to "render a finding of fact on each ... standard." *Id.* at 655, 515 A.2d 485. In marked contrast, PUC § 7–513(e) does not state that the Commission is to render a finding as to each of that subsection's factors in determining stranded costs. Rather, PUC § 7–513(e) only requires that the Commission "shall consider" certain enumerated factors in determining stranded costs. *See supra* page 437 of text for statute. Nowhere does the Act require that the Commission state its findings as to each of these factors. In fact, this Court held in *Lussier v. Maryland Racing Commission,* 100 Md.App. 190, 213, 640 A.2d 259 (1994), that the words "shall consider" in an administrative statute "only require[s] [an agency] to consider the listed factors" of the statute. *Id.* at 213, 640 A.2d 259. "[I]t is not required," we stated, "to make written findings or findings on the record." *Id.*

Indeed, *Lussier v. Maryland Racing Commission* is particularly instructive on this point and merits further explication. In that case, the Maryland Racing Commission ("Racing Commission") fined Lussier for participating in "improper acts in relation to racing." The Racing Commission imposed a fine on Lussier, pursuant to COMAR 01.10.01.10(H)(3). That regulation listed four factors that the Racing Commission "shall consider" in determining the penalty to be imposed.[7] *Id.* at

---

7. COMAR 01.10.01.10(H)(3) provides in part that "[i]n determining the penalty to be imposed, the Commission shall consider the: (a) Serious-

212–13, 640 A.2d 259. On appeal before this Court, Lussier argued that the Racing Commission erred in fining him without making a written finding as to each factor. We disagreed and stated:

> [T]he Commission is only required to consider the listed factors; it is not required to make written findings or findings on the record.... Thus, it is sufficient if the record supports the conclusion that the Commission considered these factors.

*Id.* at 213, 640 A.2d 259.

Like the regulation in *Lussier*, the statute in this case only requires the Commission to "consider" certain enumerated factors. Therefore, as in *Lussier*, "it is sufficient if the record supports the conclusion that the Commission considered these factors." *Id.* We believe that it does.

■ Our review of the record persuades us that the Commission did consider the factors enumerated in PUC § 7–513(e) in approving $528 million in stranded costs. For example, in BGE's July 23, 1999 filing, David A. Brune, Vice President and Chief Financial Officer of BGE, summarized the evidence presented by BGE on each of the PUC § 7–513(e)(1)(ii) factors:

> Q. Is the recovery of the transition cost consistent with the requirements of the Restructuring Act and consistent with the public interest?
>
> A. Yes. The Restructuring Act requires, in Section 7–513(E)(1)(II), that the Commission consider, in addition to other appropriate evidence of value: 1) book value and fair market value; 2) auctions and sales of comparable assets; 3) appraisals; 4) the revenue the company would receive under rate-of-return regulation; 5) the revenue the company would receive in a restructured electricity supply market; and 6) computer simulations provided to the Commission.

---

ness of the violation; (b) Harm caused by the violation; (c) Good faith or lack of good faith of the licensee; and (d) Licensing history of the licensee."

As part of its original July 1, 1998 testimony, BGE estimated its stranded investment through a comparison of book and market value at $1.048 billion and its total transition cost at $1.133 billion, as set forth in the Direct Testimony of Ralph Bourquin, Jr., Exhibit RHB–1. The market value of BGE's non-nuclear assets was estimated to be $1.426 billion and the market value of BGE's nuclear assets was estimated to be $305 million. The Company used a discounted cash flow methodology to calculate its stranded investment and thus compared the book value of its generation assets to the revenue it expected to receive in a restructured electricity supply market. Subsequent to the July 1 filing, various parties to this proceeding have filed their opinion as to the value of BGE's generation assets and presented testimony regarding auctions, sales of comparable assets, and appraisals. In its filing of December 22, 1998, Staff Witness Akers and Staff Witness Stuart–Paul presented testimony. Staff Witness Akers provided an overview of generation asset sales across the country. Staff Witness Stuart–Paul provided a determination of BGE's stranded costs, by making adjustments to BGE's discounted cash flow methodology, at $227.1 million; this value was also updated on March 22, 1999, to $241.9 million. OPC also filed testimony on December 22, 1998 and provided another analysis of the value of BGE's generation assets. OPC Witness Chernick calculated a stranded benefit of $1.6 billion associated with BGE's generation assets utilizing a discounted cash flow methodology, as noted on Exhibit PLC–9. Mr. Chernick also reviewed the auction process and comparable sales and calculated a market value for BGE's non-nuclear generation of $2.677 billion. Other parties filed testimony on the value of BGE's assets. MEA Witness Kahal provided an estimate of BGE's stranded costs/benefits based upon both an analysis of comparable sales ($2.2 billion pre-tax market value of non-nuclear assets) and a discounted cash flow analysis (stranded costs range between $58 million and $673 million). MAPSA Witness Younger's testimony of December 22, 1998 claimed that recent asset sales produced median revenues of

170% of book value and that such a premium would be sufficient to eliminate BGE's stranded investment. In performing these analyses, the Company, as well as other parties, estimated stranded investment in generating assets through the use of computer simulations that incorporated and considered the revenue the Company would receive. BGE, in its March 22, 1999 rebuttal testimony, offered testimony comparing the appraisal and auction processes. The Company presented testimony that the sole use of comparable sales data produced unreliable results and did not support a contention that the market value of BGE's assets exceeds book value and that the Commission should not rely solely upon this data in reaching a decision in this proceeding. BGE also filed testimony on March 22, 1999 regarding revenue losses of $331 million resulting from the onset of customer choice as compared to continued cost of service regulation.

Brune also testified to the "equitable allocation of costs or benefits between shareholders and ratepayers," set forth in PUC § 7–513(e)(2). As to that issue, Brune stated, among other things, that BGE "filed testimony demonstrating that investors did not expect to bear the risk of stranded investment and that allowed rates of return have not compensated investors for that risk." Moreover, Brune noted that "BGE's generation assets continue to be 'used and useful' in providing service to Maryland ratepayers."

Appellant further contends that the Commission ignored contrary evidence concerning the propriety of granting BGE the $528 million in stranded costs. Specifically, appellant claims that the Commission ignored the testimony of PSC witness Tracy Stuart Paul who said that BGE's stranded costs were $227.1 million, as well as the testimony of OPC witness Paul L. Chernick. Chernick testified that his estimate of the market value of BGE's generating assets exceeded BGE's estimate by $2.6 billion or by 155 percent. He further stated:

Since I assume the same value for the net book costs, there is also a $2.6 billion difference between my estimate of restructuring gain and the Company's estimate of stranded

costs. I estimate a $1.6 billion gain, while BG & E estimates $1.05 billion in stranded generation costs.

In support of its claim that the Commission erred in failing to consider the testimony of Stuart Paul and Chernick, appellant cites the following language from *Colao:*

This Court has many times held that upon appeal the Circuit Court in its review of the evidence is bound by the record made before the governmental body from which the appeal is taken. However, these decisions are directed to matters which would enhance or diminish the evidence supporting or challenging the application, such as evidentiary matters bearing on mistake or change or need and were not, in our opinion, intended as authority to exclude matters of public record which *directly relate to the arbitrary, capricious or discriminatory quality of the conduct of the zoning authority which affects the property of the applicant.*

*Colao,* 109 Md.App. at 467, 675 A.2d 148 (citations omitted)(emphasis original).

 That the Commission did not address the testimony of Stuart Paul and Chernick in the Settlement Order does not mean that the Commission acted arbitrarily or capriciously. The Commission was free to accept or reject any witness's testimony. Nor can we conclude from the mere failure of the Commission to mention a witness's testimony that it did not consider that witness's testimony.

 Moreover, the Commission did a commendable job in the Settlement Order of reviewing the evidence that both supported and opposed the stranded cost amount agreed to by the Settling Parties. For example, the Commission discussed at length the testimony of Calvin L. Timmerman, Director of the Commission's Rate Research and Economics Division. In the Settlement Order, the Commission stated: "Timmerman provided a summary of the stranded cost estimates of all of the parties, which ranged from $1.023 billion in stranded

benefits [8] to $897 million in stranded costs. Staff estimated BGE's stranded costs at $242 million. The Settlement result of $528 million, Mr. Timmerman observed, is within the range of the parties' filed positions."

The Commission then reviewed, in detail, the testimony of the Department of Natural Resources ("DNR") witness, Matthew I. Kahal. As observed in the Settlement Order, Kahal's stranded cost estimates were based upon a determination that BGE's "stranded costs associated with the [transfer of generating assets to] Calvert Cliffs nuclear generation facility would be approximately $783 million." Kahal testified that "the figure of $783 million appears to be reasonably based on Calvert Cliff's capacity rating and nuclear sales to date as compared to Calvert Cliffs recorded book value." In adopting Kahal's estimate of the Calvert Cliff's facility, DNR, after factoring in other costs and benefits associated with deregulation, found the total stranded costs to be in the range of $521 million to $633 million. The Settling Parties agreed, and ultimately the Commission found, that the figure of $528 million in stranded costs was quite reasonable as, among other things, it fell on the low end of a range of reasonable stranded costs established by expert testimony.

The Commission also considered the testimony of the various parties in opposition to the Agreement. In the Settlement Order, the Commission discussed at length the testimony of MAPSA witness, Mark Younger. In dismissing BGE's stranded cost estimate, Younger opined that a range of from "zero to $252 million" in stranded costs was more accurate. Younger also found that the Commission's preliminary estimate of stranded costs failed to include "the net value of common and general plant and should have removed deferred income taxes from the estimate of the book value of BGE's generating assets." He also complained that Timmerman's

---

**8.** Stranded benefits, unlike stranded costs, occur when the fair market value of generation-related assets exceeds the net book value of those assets. *See, e.g., Allegheny Energy, Inc. v. DQE, Inc.,* 74 F.Supp.2d 482, 493 (1999) (noting "stranded benefits exist" where generating assets are " 'worth more than their book value' ") (citation omitted).

analysis of BGE's stranded costs was based on the Maryland Energy Administration's preliminary analysis and not its final results.

Younger's testimony was answered by Brune and Kahal. Brune testified that "Younger's analysis ignored market prices for nuclear plants" and "that, on a comparative basis, recent nuclear plant sales have achieved substantially less than the sales relied on by Mr. Younger." And Kahal was no less critical of Younger's analysis and conclusions. According to the Settlement Order, Kahal stated:

> Mr. Younger failed to comprehend the distinction between after-tax stranded cost which the Company's [model] correctly produces and a valuation from a comparable sales approach which is pre-tax. He stated that Mr. Younger double counted the ADITs [accumulated deferred income taxes], once to pay the taxes and a second time to reduce the book value.

Furthermore, Kahal, according to the Settlement Order, explained:

> BGE used a financial simulation model which derived market value as the cumulative net present value of the after tax margins (or cash flow) which each generating asset is projected to provide. That model nets out income taxes from the asset's cash flow stream. Consequently, it was necessary for BGE to subtract the balance of accumulated deferred income taxes from plant net book value.

When Kahal corrected these errors and adjusted Younger's calculation accordingly, the Commission noted that Younger's overall stranded cost valuation yielded $521 million whereas the other Settling Parties' valuation yielded $663 million. Therefore, the Commission found persuasive Kahal's testimony that, taking into consideration Younger's corrected analysis, transition costs were between $521 million and $663 million, and thus the $528 million settlement figure was reasonable.

Moreover, in the Settlement Order, the Commission states that it "was not persuaded by MAPSA's argument and the

ultimate conclusions MAPSA reaches." It further notes that Brune and DNR stated "that any purchaser or transferee of Calvert Cliffs will have to pay the cost of replacing steam generators at approximately $230 million which would further depress the sale or retention of that facility."

Finally, a settlement agreement can be probative of its own reasonableness. And, in this instance, it is. Indeed, the Commission was impressed that parties representing almost all of the interests involved in this matter believed that the terms of the Agreement were reasonable, and those who did not, objected to only parts of the Agreement.

As the Commission observed:

Inasmuch as the Company, OPC, Staff, MRA/BOMA (representing commercial customers), Enron (a competitive supplier), MIG (representing industrial customers), and others, including Johns Hopkins and Calvert County, are signatories to the Settlement, it is evident that the Settling Parties deem the Settlement fair to all concerned. Although MAPSA, Statoil, Trigen, Bethlehem Steel and the City of Baltimore opposed or objected to the Settlement, their objections were limited in scope. MAPSA's primary interest was in increasing the shopping credit in order to increase the potential for competitive suppliers to compete. Statoil and Trigen also were concerned essentially about the effect the Settlement would have on fostering a competitive marketplace and on concentration of market share. Bethlehem Steel was solely concerned about the level of stranded costs allocated to it as a contract customer, and the City of Baltimore objected to the maintenance charges for street lighting.

The Commission also cited with approval the testimony of BGE witness Brune:

[Brune] testified that "[i]n consideration of such information, as well as any other information available ... the amount of stranded costs recovery, $528 million, was agreed to by the Settling Parties." He emphasized that "in settling on this amount, the parties presumably considered the

available information, considered the possible outcome of continued litigation, and considered other benefits to be gained through [s]ettlement." These parties, [Brune] stated, "represent many diverse interests and the final amount was necessarily the result of extended confidential negotiations between the parties." As such, he said, "the Settlement itself provides appropriate evidence that the agreed upon value represents a fair level of transition cost recovery for the Company."

Appellant claims, however, that the Commission's reliance on the Agreement was inappropriate and should not have been used by the Commission as evidence that the agreed-upon stranded cost recovery was reasonable. In support of that claim, appellant cites *Laclede Gas Co. v. FERC*, 302 U.S.App. D.C. 246, 997 F.2d 936 (D.C.Cir.1993).

In *Laclede,* the United States Court of Appeals for the District of Columbia Circuit reviewed an "order of the Federal Energy Regulatory Commission approving a contested settlement of the remedy phase of an enforcement proceeding against the United Gas Pipe Line Company." *Id.* at 938. Pursuant to that settlement, United was required to compensate its natural gas customers $19 million for amounts overcharged from 1972 through 1986. Although FERC applied the correct legal standard in evaluating the settlement, the federal appellate court concluded that FERC had "failed to provide an adequate explanation for its decision" to approve the settlement. *Id.* at 948. In fact, it did little more than acknowledge that a settlement had occurred and then concluded, based on that fact, that the settlement was reasonable. Suffice it to say, FERC's decision in *Laclede* has little in common with the comprehensive analysis of the evidence performed by the Commission in the case *sub judice.* It requires no extended analysis to conclude that appellant's reliance on *Laclede* is wholly misplaced.

Appellant's reliance on *Tejas Power Corporation v. FERC,* 285 U.S.App.D.C. 239, 908 F.2d 998 (D.C.Cir.1990), for the same position is no more persuasive. In that case, the United

States Court of Appeals for the District of Columbia Circuit stated that the mere fact a proposed action is a settlement agreement does not " 'establish without more the justness and reasonableness of its terms.' " *Id.* at 1003 (citations omitted). But, as we have noted, the Commission in this case considered much more than the Agreement itself in approving the proposed stranded cost recovery. Neither *Laclede* nor *Tejas Power Corporation* suggests that a settlement agreement can never be evidence of its own reasonableness, rather in most instances, it cannot be the only evidence of its reasonableness.

## III.

### (Issue 3)

 Appellant contends that the Settlement Order violates PUC § 7–505(a)(1) of the Act, which, in appellant's words, directs the Commission "to provide for a transition process that, among other things, is fair to customers and electricity suppliers." Specifically, it claims that the statement in the Settlement Order "that the market power adjudicatory proceeding ... is not needed at this time" violates not only PUC § 7–505(a)(1) but, more specifically, PUC § 7–514(a)(2) of the Act. That section states that the "Commission shall monitor the retail electricity supply and electricity supply services markets to ensure that the markets are not being adversely affected by market power or any other anticompetitive conduct." "By eliminating any market power adjudication," appellant claims, "the Commission has permitted the only currently established mechanism for determining the existence of market power to be bargained away." In advancing that argument, appellant misinterprets both the Act and the Agreement.

Section 7–514(a) provides, in part, that the Commission:

(1) may conduct an investigation of the retail electricity supply and electricity supply services markets and determine whether the function of one of these markets is being adversely affected by market power or any other anticompetitive conduct.

(2) The Commission shall monitor the retail electricity supply and electricity supply services markets to ensure that the markets are not being adversely affected by market power or any other anticompetitive conduct.

And Paragraph 51 of the Agreement states that

[t]he settling parties agree that the market power adjudicatory proceeding ... is not needed at this time. However, nothing in this Settlement precludes any party from filing a complaint with the Commission with respect to market power. Furthermore, nothing in this Settlement shall limit the rights or remedies provided in Code Section 7–514 or the rights or remedies that may exist under state or federal or common law.

Although PUC § 7–514 requires the Commission to monitor the retail electricity markets, it does not require the Commission to perform market power studies. PUC § 7–514(a)(1) states only that the Commission "may conduct" an investigation of the retail electricity supply market to determine whether it is "being adversely affected by market power or any other anticompetitive conduct." Nowhere does it or any other provision of the Act require the Commission to conduct such an investigation.

In addition, the Agreement states that the parties retain the right to file complaints regarding market power, and it does not limit that right. Nor is there anything in the Agreement that would limit the Commission's right, if it deems it appropriate, to conduct such an investigation on its own initiative. Thus, it is fanciful to suggest that the Commission, by approving this Agreement, has "bargained away" any of its powers, least of all its right to conduct a market power proceeding under PUC § 7–505(a)(1).

## IV.

### (Issues 4, 5 and 6)

Appellant next objects to the Commission's approval of the six-year 6.5% rate reduction for BGE's residential customers.

It contends that the residential rate reduction violates PUC § 7–505(d), which provides in part:

1. Subject to the provisions of paragraph (5) of this subsection, the Commission shall reduce residential rates for each investor-owned electric company by an amount between 3% and 7.5% of base rates, as measured on June 30, 1999.

2. The reduction required under sub-subparagraph 1 of this subparagraph shall begin on the initial implementation date and remain in effect for 4 years.

PUC § 7–505(d)(4)(i)(2).

Appellant also argues that "non-residential customers are clearly not 'equally protected' under the Settlement," because it is only residential, not non-residential customers, who receive a rate reduction.[9] Specifically, appellant claims that the six-year rate reduction agreed to by the parties violates the "maximum levels of price protections" set forth in PUC 7–505(d)(4)(i)(2), which requires that the reduction "remain in effect for 4 years." We disagree.

As for appellant's contention that the six-year rate reduction exceeds statutorily imposed caps, we note that in the same subsection discussing the rate reduction for "residential" customers, the Act states:

(3) As part of a settlement, the Commission may approve a cap for a different time period or an alternative price protection plan that the Commission determines is equally protective of ratepayers.

PUC § 7–505(d)(3).

Consequently, the Commission had the discretion to approve the Agreement's six-year rate cap provided that the Commission determined that the protections in the Agreement were "equally protective of ratepayers." It did. In fact, the Commission found that a six-year cap is at least as protective of ratepayers as a four-year rate cap. And the record sup-

---

9. Rates for non-residential customers will, however, be frozen for a four-year period.

ports this finding. Witnesses for OPC, BGE, DNR/MEA, and the Commission testified that the six-year rate cap in the Agreement was at least as protective of ratepayers as the four-year rate cap in the Act. For example, in response to a question from the Commission as to whether there are "any provisions in the settlement agreement which differ from the minimum standards required by the Act," OPC witness Jonathan F. Wallach testified:

The first difference is that the rate cap extends for six years, rather than the four years required by the Act. Section 7–505(d)(3) allows Commission approval of such an alternative price protection plan to the extent that the plan is "equally protective of ratepayers." A six-year rate cap, rather than a 4–year price cap, is clearly at least "equally protective of ratepayers."

When asked by the Commission whether the Settlement was "equally protective of ratepayers," Brune of BGE responded:

Yes. The best evidence of that fact is the support for this Settlement by a broad coalition of all affected customer groups. Residential customers receive a rate reduction and a price freeze for 6–years, rather than a 4–year rate cap. Non-residential customers receive customer choice on an accelerated basis, a 4–year delivery service rate freeze and various options with respect to standard offer price freeze service and the CTC recovery duration.

Finally, in the Settlement Order, the Commission observed:

**all customers** will have the opportunity to select SOS at capped rates during the transition period. This guarantees all customers protection from any adverse effect that may occur during the transition into a competitive market place.

(Emphasis added).

▉▉▉▉ Appellant also claims that the Commission's method of allocating the 6.5% rate reduction between the generation and distribution functions of BGE is flawed. To be more precise, appellant argues that the Commission's decision to

allocate 68%—or any percent for that matter—of the rate reduction to the generation component of electric service will adversely affect the competitiveness of the unregulated generation market. Appellant explains that because it "is the generation component of the electric service that the Competition Act opens to competition ... cutting BGE's rates for generation makes it more difficult for suppliers to enter the market." It points out that "distribution rates ... make a convenient hiding place for high charges since they are not subject to competition." Consequently, according to appellant, BGE will be able to "collect those high distribution rates at its leisure, knowing that it faces no competition for the provision of that service."

Appellant further argues that "not only does the application of the reduction to generation have a detrimental impact upon the development of the competitive market, it is discriminatorily applied to favor customers who remain on BGE's standard offer price freeze service." As a result, appellant claims, the reduction violates the general goals of PUC § 7–504 and the specific requirements of PUC § 7–505(d). PUC § 7–504 states that the purpose of "Electric Industry Restructuring" is to:

(1) establish customer choice of electricity supply and electricity supply services;

(2) create competitive retail electricity supply and electricity supply services markets;

(3) deregulate the generation, supply, and pricing of electricity;

(4) provide economic benefits for all customer classes; and

(5) ensure compliance with federal and State environmental standards.

PUC 7–505(d) provides in part:

(4)(i)1. Subject to the provisions of paragraph (5) of this subsection, the Commission shall reduce residential rates for each investor-owned electric company by an amount between 3% and 7.5% of base rates, as measured on June 30, 1999.

2. The reduction required under sub-subparagraph 1 of this subparagraph shall begin on the initial implementation date and remain in effect for 4 years.

3. The Commission shall determine the allocation of the rate reduction among the generation, transmission, and distribution residential rate components.

(ii) In achieving the rate reduction required under subparagraph (i) of this paragraph, the Commission shall consider:

1. the expiration of any surcharge;

2. changes in the electric company's tax liability;

3. cost of service determinations ordered by the Commission;

4. net transition costs or benefits;

5. the effect on the competitive electricity supply market;

6. whether the rate reduction and rate cap will unduly impair the electric company's financial condition;

7. the costs associated with the universal service program; and

8. the interests of the public, including shareholders of the electric company.

\* \* \*

(5) The requirements of paragraph (4) of this subsection do not apply to an electric company if the Commission approves or has in effect a settlement that the Commission determines is equally protective of ratepayers.

■■■ We agree with appellees that the language of PUC §§ 7–504 and 7–505 reflects the legislature's intent to delegate complex policy choices to the Commission's discretion. As the Court of Appeals stated in *Public Service Commission v. United Railways & Electric Co.*, 155 Md. 572, 142 A. 870 (1928), the determination of whether a given rate is burdensome "presents an extremely difficult and troubling question, the answers to which, except in extreme cases, can only rest in the judgment of the commission." *United Railways,* 155 Md.

at 596, 142 A. 870. Thus, the Commission has broad discretionary power in making such a determination. And it is our task to determine whether there is sufficient evidence in the record to support an allocation of 68% of the 6.5% rate reduction to the generation portion of BGE's electricity service. We find that there is.

Opposing the 68% allocation, MAPSA witness Terry Murray asserted that a "rate cut applied to the unbundled generation component . . . reduces the shopping credit and makes it less attractive for customers to consider alternate [sic] suppliers." In her opinion, "all of the residential rate reduction should be applied to BGE's distribution function." These and other arguments advanced by appellant were disputed by the Settling Parties, specifically OPC and the Staff of the Commission.

Supporting the 68% allocation, OPC stated that "[a]n allocation of the residential rate reduction to generation and distribution is consistent with OPC's filed position on BGE's current costs and rates." OPC explained that "it is a reasonable resolution of the rate case petition for BGE and OPC to agree on a certain level of annual rate reduction to be applied to generation and distribution [sic] 'in proportion to their contribution to total rates.'" In addition, Commission witness Timmerman, as the Settlement Order notes, "stated that allocation of the entire residential rate reduction to BGE's distribution function would result in a residential rate decrease of 15 percent for that part of BGE's regulated business, substantially above any level of overearning argued by any party."

The Commission therefore concluded that "[r]esponsible rate making would indicate a proportionate sharing of the rate reduction between the generation and distribution functions." In sum, the Commission fulfilled its statutory obligation under PUC §§ 7–504 and 7–505, and there is substantial evidence in the record to support the Commission's conclusion.

Appellant also contends that the Settlement Order improperly allocates transition costs to residential customers. That order provides, as the Settling Parties agreed, that out of

the $528 million in stranded cost recovery, $193.8 million would be allocated to residential customers. From this point on, it is not clear what appellant is claiming as to the allocation of those costs. It appears to us that it is arguing that the allocation in question will force commercial customers to subsidize residential ratepayers in violation of PUC § 7–513, which requires that stranded costs

> be allocated to customer classes in a manner that, as nearly as reasonably possible, does not exceed the cost of providing the service to those classes of customers, avoiding where reasonably possible any interclass or intraclass cross subsidy.

PUC § 7–513(a)(2).

If that indeed is appellant's argument, it is unpersuasive for three reasons. First, appellant does not specifically indicate in its brief as to how the allocation is improper. Second, as the Settlement Order observes, "the Settlement amount represents 'a compromise, agreed to by the Settling Parties, as a fair value within the range of values supported by the various parties.'" [10] And third, PUC § 7–513(a)(2) does not provide a formula for determining the allocation of stranded costs among customer classes. It only requires that the costs be allocated in a manner that "as nearly as reasonably possible, does not exceed the cost of providing services to those classes of customers." *Id.* No convincing evidence was apparently advanced below that the allocation of costs "exceed[ed] the cost of providing services" to commercial or industrial customers. We therefore conclude these costs were properly allocated by the Agreement reached by the Settling Parties and approved by the Commission.

## V.

### (Issues 7 and 8)

Appellant contends that the circuit court erred in affirming the Commission's Letter Order on two grounds.

---

**10.** Here the Commission is actually quoting with approval the testimony of BGE witness, Brune.

First, appellant argues that its appeal of the Settlement Order divested the Commission of jurisdiction over BGE's application for transfer of its generating assets. And second, it claims that BGE's transfer of its generating assets to its unregulated affiliates at book value was not supported by substantial evidence.

As stated in the Settlement Order, the Settling Parties agreed that BGE would "transfer, sell, assign or otherwise dispose of all of its generating assets, including Calvert Cliffs." The conveyance of those assets was approved by the Commission under PUC § 7–508. That section of the Act provides in part:

(c)(2) The Commission may review and approve the transfer for the sole purpose of determining:

(i) that the appropriate accounting has been followed;

(ii) that the transfer does not or would not result in an undue adverse effect on the proper functioning of a competitive electricity supply market; and

(iii) the appropriate transfer price and rate making treatment.

In accordance with the Settlement Order, BGE filed an Application For Transfer of Its Generating Assets And For Exempt Wholesale Generator Status Determinations ("application for transfer") with the Commission pursuant to PUC § 7–508(a).[11] That application was approved by the Commission in the Letter Order.

Appellant contends that because it had earlier filed an appeal of the Settlement Order in the circuit court-which was still pending when the application for transfer was filed-the Commission was divested of jurisdiction and could therefore not consider and approve BGE's application for transfer. In support of that position, appellant cites *Building Owners and Managers Assoc. of Metropolitan Baltimore, Inc. v. Public*

---

11. PUC § 7–508(a) provides that an "electric company may transfer any of its generation facilities or generation assets to an affiliate."

*Service Commission of Maryland,* 93 Md.App. 741, 614 A.2d 1006 (1992).

In *Building Owners,* the Building Owners and Manager's Association (BOMA) and OPC challenged, in the circuit court, electric rate increases granted BGE by the Commission. BGE then moved for a rehearing by the Commission and to dismiss those challenges on the ground that, by not seeking a rehearing themselves, OPC and BOMA "had failed to exhaust an available administrative remedy." *Id.* at 746, 614 A.2d 1006. The Commission denied BGE's application, ruling that the pendency of the appeals deprived the Commission of jurisdiction over the matter. When the circuit court upheld the Commission's decision to increase BGE's electric rates, BOMA and OPC appealed to this Court.

On appeal, BGE renewed its argument that BOMA and OPC had "failed to exhaust their administrative remedies by not seeking a rehearing" by the Commission. *Id.* In rejecting that argument, this Court relied on *Baltimore Gas & Electric v. Public Service Commission,* 305 Md. 145, 157–58 n. 7, 501 A.2d 1307 (1986), in which the Court of Appeals held:

The broad grant of authority in § 86(d) to rehear final orders is, we believe, impliedly limited by § 91, which authorizes the circuit court to assume jurisdiction over a final order of the Commission upon petition of an interested party. Once the circuit court has assumed jurisdiction in such a case, its jurisdiction is exclusive.

Consequently, we concluded that because "BOMA's timely order for appeal [was made] prior to the filing of any application for rehearing, jurisdiction became vested exclusively in the circuit court, thereby foreclosing any action by the Commission on any application for rehearing subsequently filed." *Id.* at 750, 614 A.2d 1006,. Relying on that case, appellant argues that the Commission's right to consider BGE's application for transfer was foreclosed by the circuit court's acceptance of appellant's petition to review the Settlement Order. We disagree.

While the Commission was divested of jurisdiction over the Settlement Order, it was not divested of jurisdiction over matters not fully considered by that order. Although the Settlement Order resolved many issues, it did not authorize the transfer of BGE's generating assets or approve, as it had reserved the right to do in the Settlement Order, the accounting procedures associated with that transfer. In the Settlement Order, the Commission stated:

The Commission maintains the right to review ... accounting procedures used upon the sale or transfer of generation assets pursuant to § 7–508(c)(2)(i) and all other authority prescribed under §§ 7–508 and 7–509 of the Act.

Moreover, the Commission's approval of the transfer of BGE's generating assets to its unregulated affiliates, while the Settlement Order was before the circuit court, did not prejudice any rights or interests of appellant. Nor could it have, as appellant was not challenging, and still is not challenging, the right of BGE to transfer such assets-only the amount of stranded costs BGE was to recover as a result of that transfer.

In addition, PUC § 7–508(b) provides that the "transfer of a generation facility or generation asset to an affiliate may not affect or restrict the Commission's determination of the value of a generation asset for purposes of transition costs or benefits under § 7–513(b)." In other words, the valuation of the assets and the transfer of those assets are two separate functions, and one does not necessarily impinge upon the other; what occurred here bears that out. The Letter Order, as the circuit court observed, "did not modify" the Settlement Order.

Moreover, the Commission has been granted "implied and incidental powers" under PUC § 2–112(b)(2), "needed or proper to carry out its functions." Consequently, the appeal of one aspect of the regulatory plan does not necessarily freeze consideration by the Commission of other aspects of that plan.

Finally, the Settlement Order was at least arguably not a final reviewable order without the implementing Letter Order. *General Motors Corporation v. Public Service Commission,* 87 Md.App. 321, 589 A.2d 982 (1991). It was therefore in the interests of appellant, as well as of the other parties to this proceeding, for the Commission to issue the Letter Order approving the transfer of BGE's assets so that the circuit court had jurisdiction to hear the appeal.

Appellant also contends that the circuit court erred in affirming the Letter Order. By approving in that order the transfer of BGE's assets to its unregulated affiliates at book value, the Commission, appellant argues, denied ratepayers a substantial benefit. Furthermore, appellant contends that the Letter Order was not supported by substantial evidence. None of these contentions survives scrutiny.

Upon close inspection, appellant's objections to the transfers of BGE's generating assets at book value are no more than a reiteration of its earlier arguments attacking the stranded cost recovery amount. When appellant argues that "the asset transfer will take place at 'book value', a regulatory issue that has little to do with the actual market value of the assets," it is re-arguing its claim that the original $528 million stranded cost estimate was not supported by substantial evidence. That claim, as noted earlier, was properly considered and rejected by the Commission.

Moreover, contrary to appellant's assertion, there was substantial evidence in the record supporting the Letter Order. In approving BGE's transfer, the Commission, in the Letter Order, considered detailed accounting information provided by various witnesses and supportive comments submitted by BGE and other parties. One such witness was Richard Barge, a BGE witness, who explained:

I think I was agreeing with the settlement that all assets would be transferred at book value, and I think that's the appropriate value to transfer them at. I am an accountant, under generally accounting principles intracompany affiliate transactions can only be done at cost or book value.

There's no other means to make the entries to get the various books to balance.

 In addition, the Act authorizes, but does not require, the Commission to review a proposed transfer of assets. PUC § 7–508(c)(2) states:

The Commission **may review** and approve the transfer for the sole purpose of determining: (i) that appropriate accounting has been followed; (ii) that the transfer does not or would not result in an undue adverse effect on the proper functioning of a competitive electricity supply market; and (iii) the appropriate transfer price and rate making treatment.

(Emphasis added).

Consequently, the Commission was not even required by the Act to review the transfer. The Commission nonetheless did so. In approving BGE's transfer in the Letter Order, the Commission addressed each of the provisions of PUC § 7–508(c)(2) and rendered findings in favor of the transfer. There the Commission stated:

Upon consideration of the arguments and comments of the parties, the Commission finds that the proposed transfer of assets and requests for certain determinations relating to EWG status are in conformance with § 7–508 and with the approved Settlement, and accordingly the application will be granted. BGE anticipates transferring generation assets with a net book value of approximately $2.05 billion. Fossil assets will be transferred to Constellation Generation, Inc. ("CGI"), a subsidiary of Constellation Enterprise. Nuclear-related assets will be transferred to Calvert Cliffs, Inc. ("CCI"), a subsidiary of Constellation Nuclear Group, LLC. When the transfer is finalized, approximately $2.714 billion in assets will be removed from electric rate base. BGE's outstanding debt obligations are comprised of $278 million in pollution control debt related to electric generating stations, approximately $819 million in Medium Term Notes (MTNs) and approximately $1.3 billion in First Mortgage Bonds. The pollution control debt will be transferred to the

affiliates because this debt specifically relates to the operation of the plants. However, the mortgage bonds and MTNs cannot be assigned meaning they cannot be assumed by the affiliate. Therefore, subject to the Internal Revenue Service ruling, BGE anticipates that the utility will receive a note from the affiliates for approximately $426 million with a maturity not to exceed one year. An additional debt offset will be provided to BGE, to achieve a total $1.1 billion debt removal. The Commission determines that the proposed accounting is both reasonable and appropriate.

The Commission also finds that the proposed transfer will not have an adverse effect on the competitive electricity supply market at this time. Both CCI and CGI will be engaged primarily in wholesale power trading. Constellation Power Source, Inc. ("CPSI") a subsidiary that owns no electric generation, transmission or distribution facilities, will be the power marketer that will supply BGE with the electric power necessary to provide Standard Offer Service to its customers during the transition period in conformity with the approved settlement. BGE seeks EWG status for CCI and CGI, who will control the generation assets but will not directly market power to BGE. CPSI will provide wholesale electric power to BGE through wholesale electric sales agreements approved by the Federal Energy Regulatory Commission. The Commission determines that the restriction discussed above, as well as the Code of Conduct contained in the approved Settlement, prevent BGE from exploiting an unfair competitive advantage in the retail electric supply market. The protections provided by the Code of Conduct in the approved Settlement, including the prohibition against marketing Standard Offer Service or competitive supply service, and the sale of the output of the transferred generating assets to the wholesale market on a non-discriminatory basis, minimize the likelihood that BGE will be capable of exerting market power.

With regard to the appropriate transfer price, the approved Settlement provides that the generating assets should be transferred at book value. With respect to the opposition of

MAPSA and Shell, their objections to the transfers at book value are essentially a reiteration of prior arguments in opposition to the Settlement, which Settlement provided for transfers to affiliates at book value. The Commission finds that these proposed transfers do not violate the 1999 Act, and further finds that the transfers conform with the approved Settlement. Also, the record indicates the Commission will be apprised of transfers approved by FERC, and the Commission hereby directs the Company to file the actual transaction accounting information when transfers are complete to assure proper accounting of the transfers. The information provided shall include actual data regarding assets and debt obligations that are assumed by the affiliates as well as journal entries that the utility will record to its books for transactions related to asset transfer. Finally, with regard to the ratemaking treatment of the asset transfer, the Commission notes as an initial matter that pursuant to the approved Settlement, ratepayers will be protected from any rate effects of the proposed transfer since rates will be frozen for a period of years. However, the Commission hereby determines that this Order shall not be construed in any manner as approval of a particular capital structure for ratemaking purposes.

* * *

In conclusion, we find the Application furthers the Settlement previously approved by the Commission and comports with § 7–508 of the 1999 Act. We further find that allowing the generating facilities involved to be eligible facilities for EWG status will benefit customers, is in the public interest, and does not violate State law.

We therefore conclude that the Commission did properly consider and approve the transfer of BGE's generating assets to its unregulated affiliates.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**